F I L E D
**United States Court of Appeals
Tenth Circuit**

**JUL 19 2004**

**PATRICK FISHER**
**Clerk**

**PUBLISH**

# UNITED STATES COURT OF APPEALS
# TENTH CIRCUIT

---

UNITED STATES OF AMERICA,

    Plaintiff-Appellee,

v.

TODD HAROLD COOPER, also
known as James M. Busch,

    Defendant-Appellant.

No. 03-4019

---

**Appeal from the United States District Court
for the District of Utah
(D.C. No. 1:00-CR-51-PGC)**

---

Edward Stanton Wall, of Wall Law Offices, Salt Lake City, Utah, for Defendant-Appellant.

Michael S. Lee, Assistant United States Attorney (Paul M. Warner, United States Attorney, with him on the brief), Salt Lake City, Utah, for Plaintiff-Appellee.

---

Before **SEYMOUR**, **McKAY** and **O'BRIEN**, Circuit Judges.

---

**SEYMOUR**, Circuit Judge.

In a two-count indictment, a federal grand jury charged Todd Harold Cooper with bank robbery in violation of 18 U.S.C. § 2113 and using a firearm while committing a crime of violence in violation of 18 U.S.C. § 924(c)(1)(A)(ii). After a trial, a jury found him guilty on both counts. Mr. Cooper appeals from the judgment of the district court on grounds of insufficient evidence, flawed jury instructions, improper denial of his request for access to a law library, and an illegal sentence. We affirm.

**I**

Shortly after 9:00 a.m. on July 17, 2003, a white male entered the First Security Bank at 3800 Washington Boulevard in South Ogden, Utah, wearing a Ronald Reagan mask and brandishing a shiny silver revolver. *See* Rec., vol. XV at 119-27, 147-51, 164-73. He announced that he was committing a robbery and ordered the bank tellers to place the bank's money on the counter. *See id.* After collecting $32,428.90 in a bag, he told the victims he had a police scanner and he would come back to kill them if they sounded an alarm. *See id.*; Rec., vol. XVI at 298. A witness described his getaway car as a black Trans-Am or Camaro. *See* Rec., vol. XVI at 257-58.

Early the next morning, an Arizona Highway Patrol trooper received a tip from a motorist that a driver who appeared to be impaired was traveling

erratically along northbound Interstate 15 in a black Camaro. *See id.* at 327-29. A little after 2:00 a.m., the officer discovered an abandoned, smoking, and steaming black Camaro parked near an exit on Interstate 15. *See id.* at 330-31. He noticed blood on the ground near the driver's side door, and learned from his dispatcher that the Camaro's Oregon license plates were registered to a Todd Cooper. *See id.* at 332, 334. After a Utah Highway Patrol trooper arrived, the officers conducted a search for the driver and found Mr. Cooper asleep under a nearby bush. *See id.* at 335. Because he was bleeding, semi-coherent, and smelled of alcohol, the troopers arrested him for driving under the influence. *See id.* at 340. Mr. Cooper had in his possession a bag containing $31,172, including eight marked bills stolen from First Security Bank, a police scanner box and police code manual, a Ronald Reagan mask, and a loaded silver revolver. *See id.* at 324-344, 346-69; Rec., vol. XVII at 643.

A grand jury charged Mr. Cooper with one count of bank robbery, in violation of § 2113, and one count of using a firearm while committing a crime of violence, in violation of § 924(c)(1)(A)(ii). After a trial, the jury returned a guilty verdict on both counts and the district court sentenced Mr. Cooper to consecutive sentences of life imprisonment for the robbery and seven years imprisonment for the firearm charge.

## II

On appeal, Mr. Cooper challenges the sufficiency of the evidence to establish that the branch bank he robbed was insured by the Federal Deposit Insurance Corporation (FDIC). He also contests the district court's aiding and abetting instruction, claims he was unconstitutionally denied access to a law library and argues the district court erred in giving him a life sentence under the "three-strikes" law. We address each argument in turn.

### A.     Sufficiency of evidence of FDIC insurance

Mr. Cooper contends the government failed to prove the First Security Bank branch at 3800 Washington Boulevard in South Ogden was insured by the FDIC. Sufficiency of the evidence is a question of law we review *de novo*. *United States v. Carter*, 130 F.3d 1432, 1439 (10th Cir. 1997). To determine whether evidence is sufficient to uphold a conviction, "we examine, in the light most favorable to the government, all of the evidence together with the reasonable inferences to be drawn therefrom and ask whether any rational juror could have found the essential elements of the crime beyond a reasonable doubt." *United States v. Arutunoff*, 1 F.3d 1112, 1116 (10th Cir. 1993). The jury has the responsibility of appraising witness credibility, weighing the testimony, drawing reasonable inferences, and reaching a conclusion. *See United States v. Beaulieu*, 900 F.2d 1531, 1533-35 (10th Cir. 1990).

Proof that the financial institution at issue was insured by the FDIC at the time of the robbery is an essential element of bank robbery that the government must prove beyond a reasonable doubt. *See* 18 U.S.C. § 2113; *United States v. Brunson*, 907 F.2d 117, 118-19 (10th Cir. 1990). To prove the South Ogden branch of First Security Bank was insured by the FDIC when it was robbed, the government offered testimony from a bank teller, a bank manager, and the official custodian of records at the FDIC.

Marianne Froerer, a bank teller at the South Ogden branch of First Security testified she had seen various insignia within the bank indicating it was insured by the FDIC, including signs at every teller window. Defense counsel objected to her testimony that the bank was insured by the FDIC on grounds that she lacked the knowledge necessary to testify competently to that fact. The court sustained the objection insofar as her testimony exceeded what she actually saw and knew directly, and the government moved on to a different line of questioning.

The bank's manager, Kerry Catt, then testified that based on his training and experience in the banking industry and with First Security in particular, he had information that the bank was insured by the FDIC when it was robbed. Mr. Catt also testified he provided the number from the bank's FDIC certificate to a federal agent. Defense counsel objected to his testimony several times on grounds of lack of personal knowledge, lack of foundation, and lack of

competence to testify as to whether or not the branch at issue was covered by an FDIC certificate. The court either permitted clarification questions or overruled each objection, eventually stating "if somebody provides a number and says here's our insurance policy, here's the number, that would be some evidence from which the jury could conclude there was FDIC insurance . . . ." *See* Rec., vol. XV at 303.

We will not disturb the district court's conduct of trial proceedings, including rulings on motions and objections, unless it affirmatively appears from the record the court abused its discretion. *Smith v. Atl. Richfield Co.*, 814 F.2d 1481, 1485 (10th Cir. 1987) (citing *Rasmussen Drilling v. Kerr-McGee Nuclear Corp.*, 571 F.2d 1144, 1149 (10th Cir. 1978)). Nothing in this record so indicates. The government established the foundation for Mr. Catt's testimony that the bank was insured. It questioned him about disclosures he was required to post throughout the branch, training he was required to provide to his staff, numerous communications and bulletins regarding those disclosures and training, his lengthy experience in banking, and his personal experience of providing the number on the insurance certificate to the federal agent. Because Mr. Catt provided evidence from which the jury could conclude there was FDIC insurance, we cannot say the district court abused its discretion in admitting his testimony.

The testimony of Valerie Best, an assistant executive secretary and official

records custodian at the FDIC, was more contentious. Ms. Best testified that a federal agent requested documentation from her regarding whether the South Ogden branch of First Security Bank was insured by the FDIC on the day of the robbery. In response to that request, she reviewed the relevant FDIC records and prepared the following documents: an affidavit, computer record printouts indicating insured status for First Security Bank (Exhibit 11A) and the South Ogden branch specifically (Exhibit 11B), and a duplicate of the insurance certificate issued to First Security Bank. She also testified that when the FDIC began insuring banks in 1934, its records were kept on index cards, but over time the records were computerized. When Ms. Best testified that Exhibit 11A was an accurate representation of the FDIC's computer records, defense counsel objected on grounds that she had not compared the computer record to "the actual record." Rec., vol. XVIII at 747. The court overruled the objection and admitted Exhibits 11A and 11B into evidence.

Ms. Best attempted to explain the computer records she had prepared, and defense counsel objected strenuously on grounds that Ms. Best was testifying solely as the custodian of records and not as a designated expert witness. In defense counsel's view, the computer records should have spoken for themselves and any explanation by Ms. Best of the information on the computer screen printouts was improper expert testimony. The court overruled the objection,

noting "I don't think she is testifying as an expert. I think she is just explaining what the screen says. I think that would be entirely appropriate. Some documents speak for themselves but I think this one might need a little explanation." *Id.* at 749.

Ms. Best then explained that Exhibit 11A was the FDIC record reflecting that the FDIC had insured First Security Bank since 1934. Turning her attention to Exhibit 11B, Ms. Best explained that over 33,000 branch banks exist in the United States and the FDIC uses a large second database to keep track of each branch. Defense counsel again objected, restating at length his objection that Ms. Best was offering her expert opinion that the bank was insured by the FDIC at the time of the robbery. According to defense counsel, "the only facts she can testify to is [sic] that these are records kept by the FDIC." *Id.* at 759. The court did not agree:

> I'm going to overrule the objection on all grounds. The witness is entitled to say what the document means. She has testified that these are all kept in the ordinary course of business. She is a custodian of records. I find this is the day-to-day testimony that is routinely given in courts all over this country. Custodian of records is entitled to say what the records mean. . . . The FDIC witness is allowed to do that. That is not an expert opinion[;] that is a description of the documents and what the documents reflect.
>
> [Defense counsel] suggested that the documents speak for themselves. I find that it is impossible in the circumstances of this case. The documents cannot speak for themselves. They are numbers and shorthands and other things like that, that an average person [–] not to mention me [–] can't determine what they mean without . . . having somebody [tell] us how the computer is set up and that sort of thing.

She is not construing the law, she is simply telling us what the records reflect.

*Id.* at 760-61.

Ms. Best then explained that the South Ogden branch of First Security Bank was established in 1957 under the same FDIC certificate number, 13718, as the main office of First Security Bank that had been insured since 1934. She testified that the FDIC does not issue separate insurance certificates for each branch, because "the bank is regarded as one corporate entity or legal entity. They're assigned a certificate number and that certificate number applies to the home office and any branches that that bank may later establish." *Id.* at 769. According to Ms. Best, on the date of the robbery, First Security Bank National Association, its South Ogden branch, and all the depositors at that branch were insured by the FDIC.

On cross-examination, defense counsel asked Ms. Best if any actual written policy existed that would indicate the South Ogden branch was insured, other than Exhibit 11. She answered "[n]o, it is a matter of law," and defense counsel asked "[a]nd so when you say that there is insurance, you're giving an opinion as to what the law provides?" After objection by the government, the court allowed Ms. Best to answer but made it clear that when she was relying on her interpretation of the law, she was not necessarily doing so within the ambit of the legal term of art: "I think what I'm going to do is allow her to answer the

question. When she says subject to her opinion that may have one meaning for her and another meaning in the eyes of the rules of evidence and the rules of law." *Id.* at 773. The court also gave an instruction clarifying that Ms. Best was merely testifying as the custodian of records: "ladies and gentlemen of the jury, this witness is here solely to describe what the documents are saying and you just disregard anything that went beyond what the documents are saying." *Id.* at 774. Finally, because this issue had been so quarrelsome, the court made clear at the conclusion of Ms. Best's testimony exactly in what capacity she had testified, and again offered to give a curative instruction if defense counsel thought it necessary:

> I just want the record to be clear in case there is an appeal on this . . . [:] Ms. Best said she was drawing an opinion as to a matter of law. I think what she meant, and I'm going to find specifically, there was some background legal law out there concerning the way the FDIC operates. And she looked at her records and told us what the records meant given that background operation of law. She was not drawing any legal conclusions. She was simply describing what the documents meant and I instructed the jury earlier that they should not draw any legal conclusions from Ms. Best's testimony.
> [Defense counsel], if there if there is any additional cautionary instruction that you would like for me to give, I'll be glad to give that to them now or later as you think fit or not do it, whatever you would like. I would be glad to consider any additional cautionary instruction. Also, if there is any instruction as to the law you would like I would be glad to give that as well.

*See id.* at 790.

As we previously stated, we will not disturb the district court's rulings on

objections to Ms. Best's testimony unless it affirmatively appears from the record that the district court abused its discretion. *Atl. Richfield Co.*, 814 F.2d at 1485. There is simply no indication the district court abused its discretion when it ruled Ms. Best was not testifying as an expert and admitted Exhibit 11 into evidence. In addition to the court's clear explanation for why it was overruling Mr. Cooper's objections to Ms. Best's testimony, the court took judicial notice outside the presence of the jury that the records at issue were prepared in the ordinary course of business and were therefore admissible under Federal Rule of Evidence 803(6). The court observed these records were fastidiously kept and commented that taking judicial notice of them as business records is authorized under the law of this circuit. *See* Rec., vol. XVIII at 762-763 (citing *United States v. Johnson*, 971 F.2d 562, 571 (10th Cir. 1992) ("A foundation for admissibility may at times be predicated on judicial notice of the nature of the business and the nature of the records as observed by the court, particularly in the case of bank and similar statements.") (quotations and citations omitted)). The district court did not err in these rulings.

The government may prove a bank was FDIC-insured at the time of a robbery in a variety of ways. *See United States v. Darrell*, 828 F.2d 644, 648 (10th Cir. 1987) (certificate of insurance alone does not adequately establish that financial institution is FDIC-insured on date of robbery, but a variety of other

evidence supporting the bank's insured status at the time of the offense, presented with or without the certificate, will satisfy the proof requirement). The testimony of Mr. Catt and Ms. Best and the introduction of Exhibit 11 constitute sufficient evidence from which the jury could determine the South Ogden branch of First Security was insured by the FDIC at the time of the robbery. In *United States v. Bindley*, 157 F.3d 1235, 1239 (10th Cir. 1998), we concluded a bank teller's testimony alone, without a certificate of insurance or any other proof of FDIC insurance, was sufficient to support the jury's finding that the bank involved was federally insured at the time of the charged crimes. Likewise, our decision in *Brunson*, 907 F.2d at 119, demonstrates that a branch manager's testimony confirming insured status, coupled with a certificate of insurance and two notices of insurance premiums, is sufficient. In *Darrell*, 828 F.2d at 648-49, we upheld the sufficiency of the evidence on insured status when the government presented authenticated certificates of insurance and notarized, sealed documents signed by the FDIC records custodian attesting that according to FDIC records, the insurance had neither lapsed nor been terminated. Finally, in *United States v. Bolt*, 776 F.2d 1463, 1471 (10th Cir. 1985), we held the government had shown proof of insured status when it presented the testimony of a bank vice-president, the bank's FDIC certificate, and a check reflecting the insurance premium had been paid for the time period in which the robbery occurred.

These decisions are consistent with those in other circuits addressing the quantum of proof acceptable for proving the federally-insured status of a bank. *See, e.g., United States v. Guerrero*, 169 F.3d 933, 944-45 (5th Cir. 1999) (in light of bank official's complete testimony, jury could find beyond a reasonable doubt that bank was federally insured at time of robbery when official testified "bank is federally insured"); *United States v. Harris*, 165 F.3d 1062, 1066 (6th Cir. 1999) (federal status element satisfied by testimony of bank employee and presentation of FDIC certificate); *United States v. Mitchell*, 136 F.3d 1192, 1193 (8th Cir. 1998) (evidence sufficient where bank's vice president testified bank is insured by FDIC, presented a form displaying bank's FDIC certificate number, and referred to a printout of bank's expense account showing payment of FDIC premium); *United States v. Bellucci*, 995 F.2d 157, 160-61 (9th Cir. 1993) (there is "no question" FDIC certificate of insurance is sufficient to prove financial institution is federally insured); *United States v. Schermerhorn*, 906 F.2d 66, 69-70 (2d Cir. 1990) (bank vice president's testimony that bank's deposits are FDIC insured sufficient)*; United States v. Gallop*, 838 F.2d 105, 111-12 (4th Cir. 1988) (testimony from bank employee that deposits are insured by FDIC is sufficient evidence from which jury may conclude bank was insured at time of robbery, even without FDIC certificate in evidence).

Mr. Cooper argues the instant case is distinguishable from this line of cases

-13-

because he objected at trial to the government's evidence on proof of FDIC insurance. His objections were overruled, however, and we have determined the district court did not err in admitting Exhibit 11 or the testimony of Mr. Catt or Ms. Best. Therefore, the government's proof of FDIC insurance was properly before the jury. Mr. Catt and Ms. Best's testimony regarding FDIC-insured status presented the jury with an opportunity to appraise their credibility, weigh their testimony, draw reasonable inferences, and reach a conclusion.[1] Viewing all the evidence together with the reasonable inferences to be drawn from it in a light most favorable to the government, we cannot say that no rational juror could have found beyond a reasonable doubt that the South Ogden branch of First Security had FDIC insurance at the time of the robbery.

---

[1]We admonish defense counsel for mischaracterizing the record with regard to this issue. Citing not only to pages of the record but to line numbers, he asserts "the trial court recognized that the bank teller and the bank manager lacked personal knowledge as to whether there was in fact FDIC insurance and excluded their testimony." Reply Br. at 2. Upon examination of the record, we discovered that counsel's citations are actually citations to his own objections. As to the bank teller's testimony, counsel is correct that the court sustained objections to her testimony on whether or not the bank was actually federally insured. *See* Rec., vol., XV at 143-44, 145-46. However, the court did allow the teller to testify as to what she saw – namely, FDIC signs in every window – from which the jury could infer it was federally insured. *See id.* at 143-146. With regard to Mr. Catt's testimony, the court either permitted the government to clarify its questions or simply overruled defense counsel's objections. *See* Rec., vol. XVI, at 299, lines 7-17 (court directs clarification); at 300, lines 3-7 (court directs clarification) and 16-25 (objection overruled); at 302, lines 11-13 (objection overruled). This hardly constitutes an exclusion of Mr. Catt's testimony.

**B.      Aiding and abetting instruction**

Mr. Cooper also asserts the district court erred by instructing the jury, over his objection, that he could be found guilty for aiding and abetting the commission of the robbery.  He contends the indictment should have contained "at a minimum a reference to 18 U.S.C. § 2 to assure [sic] due process," he was unfairly surprised by the instruction, and he did not receive adequate notice or an opportunity to defend.  Aplt. Br. at 41-42.  According to Mr. Cooper, it was improper for the government to proceed on the theory that he was the principal robber and then to ask for the aiding and abetting instruction only after he asserted in defense that he was not the actual robber.

We examine jury instructions as a whole and review *de novo* the propriety of an individual jury instruction to which objection was made at trial.  *See United States v. Scarborough*, 128 F.3d 1373, 1377 (10th Cir. 1997).  The law in this area is clear: "[i]t is well established that aiding and abetting is not an independent crime under 18 U.S.C. § 2; it simply abolishes the common-law distinction between principal and accessory."  *United States v. Scroger*, 98 F.3d 1256, 1262 (10th Cir. 1997) (citing *United States v. Langston*, 970 F.2d 692, 705 (10th Cir. 1992)).  Consequently, "a defendant can be convicted as an aider and abettor even though he was indicted as a principal for commission of the

-15-

underlying offense and not as an aider and abettor, providing that commission of the underlying offense is also proven." *See id.* (quoting *United States v. Smith*, 838 F.2d 436, 441 (10th Cir. 1988)).

We have explicitly rejected Mr. Cooper's argument in prior cases. In *United States v. Cueto*, 628 F.2d 1273, 1275-76 (10th Cir. 1980), we held it was proper to give an aiding and abetting instruction when "the government proceeded on the premise that [the defendant] was the principal in the robbery and, after all the evidence was in, switched theories and proceeded on an aider and abettor basis," holding that despite the government's actions, "it was nevertheless, under the circumstances, quite proper to give the jury an instruction on aiding and abetting." *Id.* at 1275. We determined that "[u]nder the evidence, [the defendant] was either a principal, or an aider and abettor who, in law, is deemed to be a principal. . . . [T]he record amply support[ed] a conviction regardless of whether the jury believed [the defendant] to be guilty as the principal or as an aider and abettor." *Id.*

The same is true of this case. There was significant evidence from which the jury could conclude that Mr. Cooper was either the principal robber or an aider and abettor. Officers found him less than twenty-four hours after the robbery, near a car licensed to Todd Cooper that met the description of the getaway car. In his trunk, officers discovered the same kind of Ronald Reagan

-16-

mask the robber used. When the officers found Mr. Cooper, he was in possession of a brown bag containing slightly less money than the robber took, including eight marked bills stolen from the bank. He had a police scanner box and police code manual, to which the robber had referred when threatening the victims. On his person was a loaded silver revolver similar to the one used by the robber.

As in *Cueto*, "we fail to perceive how defense counsel was misled as to the nature of the charge." *Id.* at 1275. Although counsel may not have known prior to trial whether the government was proceeding on the theory that Mr. Cooper was a principal or an aider and abettor, it became apparent when the trial started that the government was proceeding on the premise that he was the principal. Like counsel in *Cueto*, defense counsel here attempted to create the impression in the minds of the jury that someone other than Mr. Cooper had robbed the bank, and as in *Cueto*, "any 'confusion' was created by defense counsel in his understandable, and perfectly proper, efforts to create a reasonable doubt in the minds of some, if not all, of the jury as to who was the actual robber." *Id.* at 1275-76.

In *Scroger*, a case with nearly identical relevant facts, we relied on *Cueto* for the proposition that a defendant is not unfairly surprised by an aiding and abetting instruction even if it is not charged in the indictment or presented at trial:

> In this case, we fail to see how Scroger was surprised, much less unfairly surprised, by the aiding and abetting instruction. As in *Cueto*, the

-17-

indictment here charged Scroger as a principal and not as an aider and abettor and, like *Cueto*, it is true that the government prosecuted the case on the theory that Scroger was a principal and not an accessory to the charge. However, under the principles delineated in *Cueto*, Scroger knew, or should have known, that when more than one person is involved in a criminal act, the district court may properly submit an aiding and abetting instruction to the jury, even though it was not charged in the indictment or presented at trial. Therefore, we hold that Scroger was not unfairly surprised by the aiding and abetting instruction nor could he have been.

*Scroger*, 98 F.3d at 1262.

Mr. Cooper argues that

[i]n both *Cueto* and *Scroger* the United States had charged or alleged that the principles [sic] committed the offenses with others, in both cases the defendants know [sic] or should have known that the government's case was based upon the premise that "more than one person" was involved in the criminal act.

Aplt. Br. at 44. Mr. Cooper attempts to distinguish his case because he was the only person charged with the robbery. But the fact that no accomplices were charged in this case is a distinction without a difference for purposes of his "unfair surprise" argument. As the district court made clear when it overruled Mr. Cooper's objection to the instruction, it was defense counsel and not the government who presented the idea that Mr. Cooper did not actually rob the bank himself:

I'm going to deny the objection and give the instruction for these reasons[:] I find that the defendant in this trial first raised the suggestion of a second person being involved and the government's request for an aiding and abetting instruction, so far as I'm aware, seems to be solely in response to that defense tactic. Particularly either in the opening argument or early on in the case the defendant began to highlight the fact that the robber leaped

into the passenger side of the car and . . . definitely raised the implication that the robber might have been purely a passenger and somebody else was driving. And given the connection between Mr. Cooper and the car, that would raise the possibility that Mr. Cooper was the driver of the car other than the person who actually entered the bank so that the government at that point seems to me appropriately asking for an aiding and abetting instruction.

I'm further going to find there is no unfair surprise, no change in the evidence that would be required by aiding and abetting theory as opposed to the other theory. First of all since it was the defendant who raised it, it is hard to see how the defendant is surprised that an aiding and abetting instruction is given. . . . I find contrary to [defense counsel's] argument this is a quintessential case of no surprise and I would point out that the defense hasn't even begun their case yet.

Rec., vol. XVII at 590-91. When defense counsel made the tactical decision to suggest a second individual was involved in the robbery, he sacrificed the argument that Mr. Cooper was unfairly surprised by a subsequent aiding and abetting instruction. It is irrelevant that Mr. Cooper alone was charged. Under *Cueto* and *Scroger*, the jury instructions were proper. Ample evidence in this case supported Mr. Cooper's conviction, whether as a principal or as an aider and abettor. *Accord Cueto*, 628 F.2d at 1275.

## C.    Access to law library

Mr. Cooper argues he was denied due process because the district court refused his request for access to a law library. He acknowledges that he waived the right to counsel, but contends his waiver was involuntary because five attorneys represented him before he elected to proceed *pro se*, and "in the face of this parade of counsel, Mr. Cooper was finally forced to proceed pro se without a

law library."[2]  Aplt. Br. at 48.  To the extent Mr. Cooper raises for the first time on appeal the voluntariness of his waiver of counsel, we need not consider his argument.  *See Crow v. Shalala*, 40 F.3d 323, 324 (10th Cir. 1994) ("Absent compelling reasons, we do not consider arguments that were not presented to the district court.").  Because Mr. Cooper did raise in the district court his argument about access to a law library, however, we address his concerns.

We review *de novo* whether a defendant's due process rights have been violated.  *United States v. Walters*, 269 F.3d 1207, 1215 (10th Cir. 2001). Prisoners have a fundamental constitutional right of access to the courts, and must be provided with "adequate law libraries or adequate assistance from persons trained in the law."  *Bounds v. Smith*, 430 U.S. 817, 828 (1977).  We have held that availability of law libraries is only one of many constitutionally acceptable methods of assuring meaningful access to the courts, and pretrial detainees are not entitled to law library usage if other available means of access to court exist.  *See Love v. Summit County*, 776 F.2d 908, 913-14 (10th Cir. 1985).  It is well established that provision of legal counsel is a constitutionally acceptable alternative to a prisoner's demand to access a law library.  *See Lewis v. Casey*,

---

[2]Between August 22, 2000 and May 17, 2002, five attorneys were appointed to represent Mr. Cooper, all subsequently withdrawing at the insistence of Mr. Cooper.  On August 5, 2002, the court appointed stand-by counsel after Mr. Cooper chose to proceed *pro se*.  Stand-by counsel now represents Mr. Cooper on appeal.

518 U.S. 343, 350-51 (1996); *Love*, 776 F.2d at 914. When a prisoner voluntarily, knowingly and intelligently waives his right to counsel in a criminal proceeding, he is not entitled to access to a law library or other legal materials. *See United States v. Taylor*, 183 F.3d 1199, 1205 (10th Cir. 1999).

Mr. Cooper waived the assistance of counsel and decided to proceed *pro se*, and there is nothing in the record to suggest that his decision was anything but voluntary. A magistrate judge questioned him thoroughly about his decision warning him of the consequences of proceeding *pro se* before determining that his waiver of counsel was knowing, voluntary, and intelligent. The court explained that under *Taylor*, "a pro se defendant, having been offered and waived a chance to have someone like [standby counsel] represent him who would have access to legal materials, the defendant is not entitled to access to a law library." Rec., vol. VIII at 5-6. Again the court asked Mr. Cooper if he intended to proceed *pro se*:

> the main thing I want to make clear[:] is it still your intent to proceed pro se understanding you face very, very substantial criminal penalties, and trained legal assistance could be provided for you if you chose to go that route, but you nonetheless want to go pro se; is that right?

*Id.* at 8. Mr. Cooper responded in the affirmative, and the court permitted him to represent himself after finding he knowingly and voluntarily waived his right to counsel. *See id.* Later, the court clarified to Mr. Cooper exactly what his choice meant:

> [T]o the extent there was any confusion from [the magistrate's] earlier

-21-

ruling, the Court makes it clear, Mr. Cooper, that you can go one way or the other. You can't represent yourself pro se and then expect to have at the same time an attorney running around tracking down case law. That's one of the things you give up.

*Id.* at 11-12. In light of this record, it is abundantly clear Mr. Cooper's waiver of counsel was voluntary and he was not entitled to law library access. *Accord Taylor*, 183 F.3d at 1205.

In any event, the magistrate appointed standby counsel, whom Mr. Cooper ultimately acknowledged was providing "the kind of assistance [he] was looking for." Rec., vol. XIV at 3-4. Standby counsel is the equivalent of library access. *See Taylor*, 183 F.3d at 1204.

## D. Sentence

Mr. Cooper's final argument is that the district court erred by imposing a life sentence under the federal "three-strikes" law based on his commission of at least two prior violent felonies. *See* 18 U.S.C. § 3559(c). Whenever a prior conviction is relevant to sentencing, the government must establish the fact of that conviction by a preponderance of the evidence. *United States v. Simpson*, 94 F.3d 1373, 1381 (10th Cir. 1996).[3] Mr. Cooper contends the court improperly

---

[3]The rule announced in *Apprendi v. New Jersey*, 530 U.S. 466 (2000), does not apply to this case. In *Apprendi*, the Supreme Court held that "*[o]ther than the fact of a prior conviction*, any fact that increases the penalty for a crime beyond the prescribed statutory maximum must be submitted to a jury, and proved beyond a reasonable doubt." *Id.* at 490 (emphasis added). In this case, the facts that

(continued...)

shifted the burden of proof such that he was required to show he was *not* subject to a life sentence under the three-strikes provision. "We review de novo a district court's enhancement of a sentence pursuant to the 'three-strikes' statute." *United States v. Jones*, 213 F.3d 1253, 1262 (10th Cir. 2000).

The government produced certified court documents as evidence of Mr. Cooper's five prior serious felony convictions. Although Mr. Cooper disputed that the government had shown he was the Todd Cooper convicted in those cases, he offered no evidence to contradict the certified copies offered by the government. In *United States v. Oberle*, 136 F.3d 1414 (10th Cir. 1998), we upheld the application of the three-strikes provision in a similar situation. Based solely on certified copies of four prior violent felony convictions and presented with no evidence to the contrary, the district court found the defendant had committed the felonies. *See id.* at 1423-24. The court applied the three-strikes provision without conducting a separate § 3559 hearing on the underlying convictions. *See id.* We upheld the court's decision, ruling the government met its burden when it introduced certified copies of conviction and the defendant did

---

[3](...continued)
increase the penalty beyond the statutory maximum are facts of prior conviction, for which *Apprendi* makes specific exception. *See Blakely v. Washington*, 2004 WL 1402697 *4 (U.S. Wash. June 24, 2004) (reaffirming this exception); *United States v. Wilson*, 244 F.3d 1208, 1216 (10th Cir. 2001) ("The new rule of *Apprendi* specifically carves out the recidivism issue, requiring that facts 'other than the fact of a prior conviction' be proven to a jury.").

not introduce contrary evidence:

> The government introduced certified copies of [defendant's] four previous convictions. [Defendant] offered no evidence to contradict those certified copies. Consequently, the government fulfilled its burden of proving [he] had at least two prior serious violent felony convictions, and [he] was correctly sentenced to life imprisonment under the "Three Strikes" law.

*Id.* at 1424.

Mr. Cooper attempts to distinguish *Oberle* because that case did not involve a challenge to what the defendant calls "a nexus between the certified copies of the convictions and the Appellant." Reply Br. at 11. With absolutely no citation to authority, Mr. Cooper asserts:

> it is the government's burden to establish a nexus through evidence such as an admission or witnesses or the comparison of fingerprints, DNA, photographs, scars, marks, tatoos [sic], that the person being tried is the person identified in the certified copies; there is no presumption.

*Id. Oberle* does not require as much. If the government introduces certified copies of conviction from at least two prior serious violent felonies committed by a defendant who has been convicted of a third serious violent felony, the government has met its burden of proving by a preponderance that the defendant committed the prior felonies for purposes of applying the three-strikes provision of 18 U.S.C. § 3559 during sentencing. After the government introduces the certified copies of conviction, the district court must take the additional step of conducting a hearing on the § 3559 issue only if the defendant "tenders *evidence*" denying that the prior convictions pertained to him or her. *See Oberle*, 136 F.3d

-24-

at 1424 (emphasis in original). Here, as in *Oberle*, Mr. Cooper "tendered neither his own testimony nor any other evidence that the prior convictions were not his or that they did not satisfy section 3559(c)(3)'s definition of 'serious violent felony.'" *Id.* Because Mr. Cooper "offered no evidence to contradict those certified copies," *id.*, he was correctly sentenced to life imprisonment under the three-strikes provision.

For the foregoing reasons, we **AFFIRM**.