**UNITED STATES OF AMERICA,**
Plaintiff,

v.

**Robert VIGIL, Defendant.**

**No. CR 05–2051 JB.**

United States District Court,
D. New Mexico.

Jan. 12, 2007.

David C. Iglesias, United States Attorney, Jonathon M. Gerson, Steven C. Yarbrough, Assistant United States Attorneys,

United States Attorney's Office, District of New Mexico, Albuquerque, New Mexico, for the Plaintiff.

Jason Bowles, B.J. Crow, Bowles & Crow, Albuquerque, New Mexico and Samuel H. Bregman, II, Eric Loman, Bregman Law Firm, P.C., Albuquerque, New Mexico, for the Defendant.

## MEMORANDUM OPINION AND ORDER

BROWNING, District Judge.

**THIS MATTER** comes before the Court on the Defendant Robert Vigil's Motion to Set Aside Verdict and for Judgement of Acquittal on Count 24 of the Fifth Superseding Indictment Under Fed. R.Crim.P. 29 or in the Alternative for New Trial on Count 24, filed October 5, 2006 (Doc. 411)("Motion to Acquit"). The Court held a hearing on this motion on December 1, 2006. The primary issues are: (i) whether the evidence was sufficient for a reasonable jury to find beyond a reasonable doubt that Vigil attempted to extort property from George Everage through the wrongful use of fear of economic harm and under color of official right; (ii) whether the jury's verdict finding Vigil guilty of attempted extortion under the Hobbs Act is invalid as a matter of law because the victim of the attempted extortion, Everage, never acquired a property interest from which to extort; (iii) whether the evidence the United States presented at trial established a nexus between Vigil's conduct and interstate commerce; and (iv) whether Vigil's conviction offends due process because the Hobbs Act does not provide adequate notice that the conduct the United States alleged violates the Act. Because the Court finds that the evidence is sufficient to convict Vigil under either of the alternate theories upon which the Court instructed the jury, that Everage's

reasonable belief in some form of economic profit resulting from a contract with the New Mexico State Treasurer's Office ("NMSTO") established a property interest, that the attempted extortion possessed the requisite nexus to interstate commerce, and that Vigil's conviction does not offend due process, it finds that a reasonable jury could have found beyond a reasonable doubt that Vigil attempted to extort property from Everage, and will therefore deny the motion.

## FACTUAL BACKGROUND

Much of the factual evidence pertinent to this motion is not in dispute. Vigil does not seriously contend that the evidence presented at trial was insufficient for a reasonable jury to find that Vigil intended to extort Everage or that he took some steps toward extorting Everage. The issue is whether, as a matter of law, Vigil's conduct constitutes a violation of the Hobbs Act.

### 1. Evidence of Vigil's Motive to Commit the Crime.

The United States contends that it presented evidence at trial of several factors that motivated Vigil, while serving as the New Mexico State Treasurer, to transfer funds to Michael Montoya, the former State Treasurer who preceded Vigil. *See* United States' Response to Motion to Set Aside Verdict and For Judgment of Acquittal on Count 24 of the Fifth Superseding Indictment Under Fed.R.Crim.P. 29 as the Evidence is Insufficient to Sustain a Conviction at 3, filed October 19, 2006 (Doc. 412). First, there is evidence that, in 1999, after Vigil was unsuccessful in his bid to run for Governor of New Mexico, Montoya hired Vigil as his Deputy State Treasurer. *See* Transcript of Trial at 158:10–15 (Montoya)(taken September 13, 2006)("Sept. 13 Transcript").[1] There is

---

1. The Court's citations to the transcript of the trial refer to the Court Reporter's original,

also evidence that, later, when Vigil ran for the position of Treasurer, Montoya, in combination with Angelo Garcia and Kent Nelson, provided Vigil significant monetary and other support. *See id.* at 242:22—243:12. There was evidence presented that Montoya and Garcia kept a record of these expenditures, that they shared this record with Vigil, and that they indicated to Vigil that they, and Nelson, had mutually contributed to cover these expenses. *See id.* at 258:6–14; 263:2–6.

The United States further asserts that it presented evidence that Vigil failed to report these contributions on his campaign finance report forms and knew that Montoya possessed documents through which he could prove Vigil received this money. *See* United States' Response at 4. Montoya testified that he showed these documents to Judy Espinosa, the NMSTO's public relations officer, and Espinosa confirmed that she confronted Vigil about what she believed were contributions missing from his campaign finance reports. *See* Sept. 13 Transcript at 285:2–286:24 (Montoya); Transcript of Trial at 49:11–14 (Espinosa)(taken September 19, 2006)("Sept. 19 Transcript").

In addition, there was also evidence presented that Montoya pressured Vigil by threatening to run against him in the next election. *See* Sept. 13 Transcript at 283:10–15 (Montoya). The jury heard a recorded conversation in which Vigil told Garcia that, if the NMSTO was going to contract with George Everage for securities lending, the NMSTO needed to ensure that Samantha Sais, Montoya's wife, receive a job as part of the transaction. *See* Transcript of Recorded Conversation at 7 (taken February 23, 2005)(Government's Exhibit 589–T)("Exhibit 589–T"). This

statement was followed by Vigil's acknowledgment that "[Montoya] is all over there telling everybody he's running for Treasurer." *Id.* Similarly, during a conversation with Nelson on May 2, 2005, Vigil indicated that he felt he could prevent Montoya from running for State Treasurer by securing Sais a job in the securities-lending project. *See* Transcript of Recorded Conversation at 38–39 (taken May 2, 2005)(Government's Exhibit 592–T).

### 2. Securities Lending

Everage testified that he proposed to Vigil that the NMSTO initiate a securities-lending program to earn additional income on the office's securities inventory. *See* Transcript of Direct Testimony of George Everage at 23:7–19 (Everage)(taken September 15, 2006)("Everage Direct Examination"). Everage indicated that Vigil was initially reluctant because of his awareness that other state agencies had enjoyed varying degrees of success implementing similar programs. *See id.* at 24:24–25:3. In response to Vigil's concerns, Everage suggested that the NMSTO could use multiple securities-lending agents, and bid the project out to the various agents to create competition and to ensure the NMSTO a better yield on its lending activity. *See id.* at 25:17–21. Everage estimated that the NMSTO could earn between one and three million dollars annually through the securities-lending program. *See id.* at 31:19–23. Everage understood, however, that the securities-lending program had the potential to not make money or to make less money than he estimated. *See id.* at 149:10–15; Transcript of Cross–Examination and Redirect–Examination of George Everage at 13:21–14:1 (Everage)(taken September 18, 2006)("Everage Cross–Redirect").

unedited version. Any final transcript may contain slightly different page and/or line numbers.

To institute the securities-lending program, Everage recommended that the NMSTO create a position—securities-lending oversight manager ("SLOM")—to oversee the securities-lending agents and to ensure the agents complied with the NMSTO's investment policy. *See* Everage Direct Exam at 27:15–22. Everage stated that when he proposed the securities-lending plan to Vigil, he told Vigil that a NMSTO employee could handle the SLOM position's duties "in-house," or the NMSTO could contract with a third-party to act as the SLOM. *Id.* at 32:4–12. Everage represented that Vigil decided to issue a contract for the SLOM position, because the NMSTO did not have the budgetary resources to have an in-house employee perform the job functions. *See id.* at 36:9–14. Everage also understood that the New Mexico Legislature never allocated the NMSTO funds to have the SLOM position funded in-house. *See* Everage Cross–Redirect at 37:12–15. Upon learning that the NMSTO would contract the SLOM position, Everage informed Vigil that, if and when the securities-lending program was implemented, Everage would like the opportunity to bid on the contract for the SLOM position. *See* Everage Direct Examination at 36:22–23.

Everage, in association with several other NMSTO employees—Vigil, Assistant State Treasurer Ann Marie Gallegos, Deputy State Treasurer Elaine Olah, the NMSTO's counsel, Dave Romero, and the NMSTO's Investment Advisor, Mark Canavan—drafted a request for proposals ("RFP") for the SLOM position. *See id.* at 43:6–16; Notice of Request for Proposals for Securities Lending Oversight Manager (Government's Exhibit 512)("SLOM RFP"). Among the provisions included in the RFP for the SLOM position was a prohibition against subcontracting work the SLOM would perform on behalf of the NMSTO. *See* Everage Direct Examination at 46:8–14; SLOM RFP, Part II.C

¶ 4. The RFP for the SLOM position also indicated that the State Treasurer could terminate any contract between the NMSTO and the SLOM at will. *See* Everage Cross–Redirect at 22:2–4; 22:11–14; SLOM RFP, Professional Service Contract ¶ 5. Finally, the RFP established that the SLOM would be paid a fee calculated as a percentage of the value of securities that the NMSTO's lent. *See* Everage Cross–Redirect at 35:17–23; SLOM RFP, Professional Service Contract ¶ 2.

Everage testified that, when he informed Vigil that he was interested in applying for the SLOM position, Vigil indicated that he had a friend whose wife needed a job and inquired if Everage would be willing to hire her should he receive the SLOM contract. *See* Everage Direct Examination at 37:5–12. Everage learned that this woman was Sais. *See id.* at 38:3–9. Everage testified that Vigil told him that Sais "was being a pain in his ass," and that he would appreciate Everage assisting him in "get[ting] her off his ass." *Id.* at 41:13–15.

### 3. *SLOM Contract.*

At Vigil's request, Romero performed an evaluation and determined that the NMSTO could legally award the SLOM contract to a former state employee. *See id.* at 49:13–24. On April 15, 2005, Everage left his position at the NMSTO with the intention of seeking the SLOM contract. *See id.* at 43:17–22; 44:1–4.

On April 29, 2005, Everage met with Sais in Albuquerque to discuss her professional background and qualifications. *See id.* at 53:8–14. Based on this meeting, Everage concluded that Sais did not have any knowledge regarding securities lending, and decided that he did not wish to hire her. *See id.* at 59:24–60:10. In addition, during their April 29, 2006 conversation, Sais represented to Everage that

Vigil owed favors to Montoya and that Montoya was contemplating running against Vigil for State Treasurer in 2006. *See id.* at 60:17–21. Subsequent to his meeting with Sais, Everage called Vigil to discuss the results of the meeting. *See id.* at 61:3–6. Everage testified that, based on this conversation with Vigil, it was his understanding that, if he did not hire Sais, he would not be considered for the SLOM position. *See id.* at 61:8–9.

Everage submitted a bid for the SLOM contract on May 3, 2005; his bid did not include any role for Sais as part of his contract performance. *See id.* at 62:12–17. Everage acknowledged that, at the time he submitted his application for the SLOM position, he did not have a vested right in the SLOM contract, and that Vigil had the authority to cancel the NMSTO's request for proposals and/or not to proceed with the securities-lending program. *See id.* at 77:20–78:6.

Everage faxed an addendum to his bid for the SLOM contract to the NMSTO on May 12, 2005. *See id.* at 81:7–8. This addendum characterized Sais as a subcontractor, indicated that Sais would send her resume directly to the NMSTO, and represented that Everage would employ Sais as a subcontractor if the NMSTO specifically approved the use of a subcontractor. *See id.* at 81:20–24. Everage also drafted a Memorandum of Understanding documenting the terms of his agreement with Sais. *See* Everage Cross–Redirect at 26:14–17. Everage testified that he and Sais never signed the Memorandum of Understanding and the NMSTO never sent him an amended version of the contract authorizing the use of subcontractors. *See* Everage Direct Examination 130:7–14; Everage Cross–Redirect at 28:10–12.

Everage testified that, at some point between May 12, 2005 and May 30, 2005, someone from the NMSTO called him and told him that the NMSTO would send him the responses to a request for proposals regarding securities-lending that the NMSTO had distributed to securities-lending agents. *See* Everage Direct Examination at 85:24–86:2. Everage also stated that he received from the NMSTO a contract for the SLOM position that had changed the conditions of the original proposal he had submitted to the office and requested that he sign and return the contract. *See id.* at 86:15–18. Everage signed the contract and returned it to the NMSTO along with a request that Vigil sign a copy of the contract and return it to Everage. *See id.* at 88:4–9. Everage testified that, when he signed the contract and returned it to the NMSTO, he believed that the contract had been consummated. *See id.* at 91:7–14. Everage testified that, accordingly, the NMSTO sent him the bid proposals of three securities-lending agents and that he reviewed and evaluated these agents' applications for the securities-lending agent position. *See id.* at 93:17–22; 94:3–5. Finally, Everage also indicated that he had been invited to attend a June 16, 2005 meeting that had been scheduled so that NMSTO's securities-lending evaluation committee could consider the securities-lending agents' applications. *See id.* at 97:17–21.

On June 10, 2005, Everage met with Sais for a second time in an attempt to negotiate a fee-sharing arrangement for fees generated through the SLOM position. *See id.* at 102:7–9. At the conclusion of this meeting, Everage made a final determination that he would not be able to employ Sais. *See id.* at 105:14–18. Following this meeting, on June 13, 2005, Everage spoke to Vigil by telephone. *See id.* at 105:19–23. Everage indicated to Vigil that he had offered Sais forty percent of the SLOM's net proceeds, and Vigil replied: "No, no just deal with this George, we can't, we can't deal with net, it can't work." Transcript of Recorded Conversation at 2

(recorded June 13, 2005)(Government's Exhibit 591–T). It was Everage's understanding as a result of this conversation that Vigil was unhappy that Everage and Sais could not reach some arrangement, and Everage felt that Vigil was threatening to cancel his contract with the NMSTO if Everage and Sais could not resolve their disagreement. *See* Everage Direct Examination at 111:11–12; 112:9–12; Everage Cross–Redirect at 80:4–7.

At Vigil's advice, Everage followed up his conversation with Vigil by calling Gallegos. *See* Everage Direct Examination at 122:8–9. After speaking to Gallegos, Everage considered his prospects of working as the SLOM to be extinguished. *See id.* at 122:14–16. Everage documented his concerns regarding what he perceived as Sais' attempt to extort the NMSTO in a letter to Vigil dated June 13, 2006. *See id.* at 122:24–123:1. In the letter to Vigil, Everage summarized his position: "I would hope that the threat made by you and Ms. Gallegos, that is, if Ms. Sais's demands are not met by [Everage], that the existing SLOM contract will be repudiated and a new RFP issued and by implication that [Everage] will likely not be reselected as SLOM for securities lending, will not be acted upon." Letter from George Everage to Robert Vigil at 2 (dated June 13, 2005)(Government's Exhibit 521). *See* Everage Direct Examination at 126:7–13.

The NMSTO responded to Everage's June 13, 2005 letter in a letter dated June 23, 2005. *See* Everage Direct Examination at 128:21–129:1; Letter from Ann Marie Gallegos to George Everage (dated June 23, 2005)(Government's Exhibit 528)("Gallegos Letter"). The NMSTO's letter asserted that, at the time of the letter's writing, there was no legal contract in effect between Everage and the NMSTO. *See* Everage Direct Examination at 129:15–17; Gallegos Letter at 1. The letter

further indicated that prior communications were an attempt to negotiate acceptable terms, not actual or implied threats, and that Everage "must surely recognize that in responding to the RFP, and including Ms. Samantha Sais as a proposed subcontractor, that [the NMSTO's] evaluation of [Everage's] proposal would include an evaluation of the knowledge, skills and abilities you [and Sais] both offer." Gallegos Letter at 1. *See* Everage Direct Examination at 129:23–130:2; Everage Cross–Redirect at 66:2–5. The letter concluded:

> In any event, we must conclude negotiations or failing that, reissue the RFP and hope for more satisfactory responses. Should you fail to respond to this request by 5:00 p.m. July 8, 2005, we will consider your offer withdrawn and will proceed with the re-issuance of the RFP for a Securities Lending Oversight Manager.

Gallegos Letter at 2 (bold emphasis in original). *See* Everage Direct Examination at 131:10–16. Everage noted that Romero was among the recipients carbon-copied on the letter. *See* Everage Direct Examination at 131:25–132:8.

Everage responded to the NMSTO's letter in a letter dated July 7, 2005. *See* Everage Direct Examination at 132:19–23; Letter from George Everage to Ann Marie Gallegos (dated July 7, 2005)(Government's Exhibit 529)("Everage Response Letter"). In the letter, which Everage's wife, an attorney, assisted in drafting, Everage argued that there was a legal contract in effect between Everage and the NMSTO and that, in preparing the report evaluating the securities-lending agents that had submitted bids to the NMSTO, Everage had performed pursuant to that contract. *See* Everage Response Letter at 1; Everage Direct Examination at 133:20–134:6. Everage further maintained that his failure to employ Sais could not invalidate the

contract because Sais was a subcontractor, the contract expressly prohibited subcontracting, and that the contract had never been amended or reformed to allow subcontracting. *See* Everage Response Letter at 1; Everage Direct Examination at 134:13–20. In a letter dated July 15, 2005, Romero responded to Everage's letter alleging Everage's legal analysis was flawed, and re-asserting that no contract existed between Everage and the NMSTO. *See* Everage Direct Examination at 139:1–9; Letter from Dave Romero to George Everage (dated July 15, 2005)(Government's Exhibit 530).

Everage testified that he did not lose any money as a result of the NMSTO cancelling any SLOM contract he might have had. *See* Everage Cross–Redirect at 16:4–6. Everage did acknowledge, however, that he had indicated to Sais, in a tape-recorded conversation, that he lost $5,000.00 to $6,000.00 per month in projected earnings as a result of the NMSTO rescinding his contract. *See id.* at 17:1–2; 17:11–16. Everage emphasized that these were projected losses; he testified that "[t]here was no money for me to lose. I never had it in my hand." *Id.* at 20:10–11.

### 4. *The Second RFP.*

On August 9, 2005, the NMSTO issued a revised RFP for the SLOM position. *See* Request for Proposals for Professional Services to Provide Securities Lending Oversight Manager Services to the Office of the New Mexico State Treasurer at 5 (Government's Exhibit 532)("Second SLOM RFP"). The Second SLOM RFP contained a provision that granted the NMSTO the discretion to bifurcate the SLOM position into two components and award separate contracts to: (i) a securities-lending manager; and (ii) an information technologies ("IT") manager. *See id.,* Part I.C.

Andrew Perkins, a former contract employee at the NMSTO, submitted a bid in response to the Second SLOM RFP. *See* Transcript of Trial at 38:13–15 (Perkins)(taken September 18, 2006)("Sept. 18 Transcript"). Perkins' proposal indicated that he was partnered with Thomas Chepucavage, an individual with a bachelor's degree in information technology and professional experience as an information technology consultant with Accenture Consulting. *See id.* at 40:2–10. Perkins was aware, however, that two or more contracts could be awarded. *See id.* at 60:2–6.

Several days after receiving Perkins' response to the Second SLOM RFP, Gallegos contacted Perkins and informed him that the NMSTO had awarded the IT portion of the SLOM contract to Sais. *See id.* at 45:10–12. At a subsequent meeting at the NMSTO involving Vigil, Perkins, Sais, and Gallegos, Vigil informed Perkins that thirty percent of the fees generated through securities-lending would be allocated to Perkins' firm, and that Sais would receive half of that thirty percent. *See id.* at 49:4–10. Perkins testified that he would have preferred to work with Chepucavage, but did not believe working with Sais was optional. *See id.* at 50:20–51:5.

### PROCEDURAL BACKGROUND

On July 25, 2006, a grand jury returned a Fifth Superceding Indictment charging Vigil with twenty-four counts of racketeering and extortion in violation of the Racketeer Influenced and Corrupt Organizations Act ("RICO"), 18 U.S.C. § 1962(c)-(d), and the Hobbs Act, 18 U.S.C. §§ 1951 & 1952. *See* Fifth Superceding Indictment, filed July 25, 2006 (Doc. 259). The Court held a jury trial in this case from September 5, 2006 to September 30, 2006. On September 28, 2006, at the close of the United States' evidence, Vigil moved, under rule 29 of the Federal Rules of Criminal Proce-

dure, to dismiss all charges. The Court took the motion under advisement, but indicated to the parties that it was inclined to submit all the counts to the jury. *See* Transcript of Trial at 147:2–149:1 (Court)(taken September 28, 2006). Subsequent to the Court reserving its ruling, Vigil chose not to present any evidence. The jury returned a verdict on September 30, 2006 finding Vigil not guilty on Counts One through Twenty–Three and guilty on Count Twenty–Four of the Fifth Superceding Indictment. *See* Verdict, filed September 30, 2006 (Doc. 408).

Count Twenty–Four of the Fifth Superseding Indictment charges:

Between May 2, 2005 and September 15, 2005, both dates being approximate and inclusive, in the State and District of New Mexico, the defendant Robert Vigil, did knowingly and unlawfully affect and attempt to affect interstate commerce and the movement of articles and commodities in interstate commerce by extortion, in that the defendant Robert Vigil attempted to cause George Everage to provide money and property to another person, with Everage's consent, induced by wrongful use and threat of use of economic harm and under color of official right, in connection with Everage's efforts to work as the Securities Lending Oversight Manager for the New Mexico State Treasurer's Office.

On October 5, 2006, Vigil filed this motion requesting the Court, pursuant to rule 29 of the Federal Rules of Criminal Procedure, acquit him as a matter of law on Count Twenty–Four of the Fifth Superseding Indictment. In the alternative, Vigil moves for a new trial on that count.

### RULE 29

Rule 29(b) of the Federal Rules of Criminal Procedure permits a trial court to reserve decision on a defendant's motion for judgment of acquittal, made at the close of the government's evidence, and to submit the case to the jury. *See* Fed. R.Crim.P. 29(b). If the court submits the case to the jury, and the jury returns a guilty verdict, the defendant may renew his motion within seven days after a guilty verdict. *See* Fed.R.Crim.P. 29(c). The rule provides that, if the trial court decides to reserve its decision, "it must decide the motion on the basis of the evidence at the time the ruling was reserved." Fed. R.Crim.P. 29(b).

### STANDARD FOR DECIDING MOTIONS FOR ACQUITTAL

The Supreme Court of the United States has long recognized the government's burden to prove every element of a criminal charge beyond a reasonable doubt as a constitutional imperative. *See In re Winship,* 397 U.S. 358, 362, 90 S.Ct. 1068, 25 L.Ed.2d 368 (1970). This requirement, applied though the rules of evidence consistent with that standard, is a "historically grounded right[ ] of our system, developed to safeguard men from dubious and unjust convictions, with resulting forfeitures of life, liberty and property." *Id.* (quoting *Davis v. United States,* 160 U.S. 469, 488, 16 S.Ct. 353, 40 L.Ed. 499 (1895)).

When reviewing challenges to the sufficiency of evidence underpinning a criminal conviction, courts must evaluate the direct and circumstantial evidence, together with all reasonable inferences that might be drawn from that evidence, in the light most favorable to the government, and determine whether a reasonable jury could find the defendant guilty beyond a reasonable doubt. *See United States v. Isaac–Sigala,* 448 F.3d 1206, 1210 (10th Cir.2006). A court should "not overturn a jury's finding unless no reasonable juror could have reached the disputed verdict." *United States v. Carter,* 130 F.3d 1432, 1439 (10th Cir.1997). The court should let stand the conviction where a "rational trier

of fact could have found the essential elements of the crime beyond a reasonable doubt." *United States v. McPhilomy*, 270 F.3d 1302, 1307 (10th Cir.2001)(quoting *Jackson v. Virginia*, 443 U.S. 307, 319, 99 S.Ct. 2781, 61 L.Ed.2d 560 (1979)).

■■■ In evaluating a sufficiency-of-the-evidence challenge made after a defendant has presented his case-in-chief, the court is not limited to reviewing the government's case-in-chief alone, but may review the entire record, including evidence that the defendant presents. *See United States v. Delgado–Uribe*, 363 F.3d 1077, 1082 (10th Cir.2004). The court may not, however, weigh conflicting evidence or consider the credibility of witnesses. *See United States v. McKissick*, 204 F.3d 1282, 1289 (10th Cir.2000). It is the jury's responsibility to appraise witness credibility, weigh testimony, draw reasonable inferences, and reach a conclusion as to a defendant's guilt. *See United States v. Cooper*, 375 F.3d 1041, 1044 (10th Cir.2004). The court's duty is to "determine whether the evidence, if believed, would establish each element of the crime." *United States v. Vallo*, 238 F.3d 1242, 1247 (10th Cir.2001)(quoting *United States v. Evans*, 42 F.3d 586, 589 (10th Cir.1994)).

■■■ Although the jury's decision is afforded great deference, "the evidence, when viewed in its entirety, must generate more than a mere suspicion of guilt, and where such evidence is equally consistent with both guilt and innocence the conviction cannot be sustained." *United States v. Weidner*, 437 F.3d 1023, 1032 (10th Cir.2006)(quoting *United States v. Fox*, 902 F.2d 1508, 1513–14 (10th Cir.1990)). In reaching a conviction, juries have "wide latitude to determine factual issues and to draw reasonable inferences from circumstantial evidence," but inferences are reasonable only when, "with experience serving as the touchstone[,] ... there is a reasonable probability that the conclusion flows from the facts in evidence." *United States v. Summers*, 414 F.3d 1287, 1295 (10th Cir.2005)(internal citation omitted). Where an inference relates to an ultimate conclusion underpinning criminal liability, "a jury may draw [the] inference only where that inference can be made beyond a reasonable doubt." *Id.* at 1295 n. 4 (quoting *United States v. Rahseparian*, 231 F.3d 1257, 1264 (10th Cir.2000)).

## LAW REGARDING ALTERNATE THEORIES

■■■ An indictment is duplicitous if it conjunctively charges two or more offenses in the same count. *See United States v. Haber*, 251 F.3d 881, 888 (10th Cir.2001). Where an indictment is duplicitous, the accused may request that a special verdict form, or "an augmented instruction requiring unanimity on one or the other of the acts charged within a count," be used so as to ensure unanimity. *United States v. Trammell*, 133 F.3d 1343, 1354–55 (10th Cir.1998). A defendant's failure to timely challenge his indictment on duplicity grounds, however, waives any later challenge based on a failure to use a special verdict form. *See United States v. Haber*, 251 F.3d at 888–89. Accordingly, "[w]hen a jury returns a guilty verdict on an indictment charging several acts in the conjunctive, ... the verdict stands if the evidence is sufficient with respect to any one of the acts charged." *Griffin v. United States*, 502 U.S. 46, 56–57, 112 S.Ct. 466, 116 L.Ed.2d 371 (1991).

■■■ Charging a single offense involving a multitude of alternative methods and/or courses of action, however, does not necessarily render a charge duplicitous. *See United States v. Wiles*, 102 F.3d 1043, 1062 (10th Cir.1996); Fed.R.Crim.P. 7(c)(1) ("A count may allege that the means by which the defendant committed the offense are unknown or that the defendant committed it by one or more specified means."). Still, courts recognize that, this

situation, in the absence of a special verdict, presents the danger that a defendant may be convicted without the jury unanimously agreeing on the particular acts that constitute the basis of the offense in violation of the Sixth Amendment. *See United States v. Jaynes,* 75 F.3d 1493, 1502 n. 7 (10th Cir.1996); *United States v. Fredette,* 315 F.3d 1235, 1242 (10th Cir.2003)(acknowledging the Sixth Amendment requires unanimity to convict a defendant in a federal jury trial); *United States v. Linn,* 31 F.3d 987, 991 (10th Cir.1994)(same)(citing *Johnson v. Louisiana,* 406 U.S. 356, 369, 92 S.Ct. 1620, 32 L.Ed.2d 152 (1972)(Powell, J., concurring)). Nevertheless, in the Tenth Circuit, a lack of a special verdict or particularized instruction does not undermine a guilty verdict, because "a general instruction on the requirement of unanimity suffices to instruct the jury that they must be unanimous on whatever specifications they find to be the predicate of the guilty verdict." *United States v. Sasser,* 971 F.2d 470, 477 (10th Cir.1992).

### THE HOBBS ACT

The Hobbs Act makes conduct unlawful which "in any way or degree obstructs, delays, or affects commerce or the movement of any article or commodity in commerce, by robbery or extortion." 18 U.S.C. § 1951(a). The Act defines "extortion" as "the obtaining of property from another, with his consent, induced by wrongful use of actual or threatened force, violence, or fear, or under color of official right." 18 U.S.C. § 1951(b)(2).

■■■■ The essence of a Hobbs Act violation is the wrongful means that a defendant employs to obtain the property in question, *i.e.* "a lawful right to property or lawful authority to obtain property is not a defense to extortion; rather, if an official obtains property that he has lawful authority to obtain, but does so in a wrongful manner, his conduct constitutes extortion

under the Hobbs Act." *Robbins v. Wilkie,* 433 F.3d 755, 769 (10th Cir.2006). On the other hand, government officials acting zealously within their statutory powers do not violate the Hobbs Act merely because the results of their actions are adverse to a particular entity or business activity. *See id.* at 769–70; *Sinclair v. Hawke,* 314 F.3d 934, 943–44 (8th Cir.2003)(noting "bank regulators do not become racketeers by acting like aggressive regulators"). Liability attaches only when a public official "obtains a 'payment to which he was not entitled, knowing the payment was made in return for official acts.'" *United States v. Kelley,* 461 F.3d 817, 826 (6th Cir.2006)(quoting *Evans v. United States,* 504 U.S. 255, 268, 112 S.Ct. 1881, 119 L.Ed.2d 57 (1992)).

■■■■ With regard to fear of economic loss, specifically, federal courts have acknowledged that this fear plays a legitimate role in many economic transactions.

[F]ear of economic loss plays a role in many business transactions that are entirely legitimate; awareness of that fear and use of it as leverage in bargaining, in which each side offers the other property, services, or rights it legitimately owns or controls, is not made unlawful by the Hobbs Act. What the Act reaches is not mere hard bargaining but the exploitation of the fear of economic loss in order to obtain property to which the exploiter is not entitled.

*Brokerage Concepts, Inc. v. U.S. Healthcare, Inc.,* 140 F.3d 494, 523–24 (3d Cir.1998)(quoting *United States v. Capo,* 791 F.2d 1054, 1062 (2d Cir.1986)("*Capo I*"), *vacated in part on other grounds,* 817 F.2d 947 (2d Cir.1987)). Finally, "economic loss" under the Hobbs Act is not limited to the loss of tangible property or existing relationships, "but may be no more than the [victim's] right to make his business decisions free of threats and coercion, or other intangible rights." *United States v.*

*Lewis,* 797 F.2d 358, 364 (7th Cir.1986). *See United States v. Kelley,* 461 F.3d at 826 ("Under the 'fear of economic harm' theory, the defendant receives payment from the victim because the victim believes that the defendant can exercise his or her power to the victim's economic detriment."); *Capo I,* 791 F.2d at 1062 (stating that concept of economic loss encompasses a lost opportunity to enter into a business relationship).

## ANALYSIS

Vigil states that, to have violated the Hobbs Act, he must have: (i) wrongfully attempted (ii) to obtain property from Everage (iii) with Everage's consent (iv) by wrongful use of actual or threatened fear or under color of official right. *See* Motion to Acquit at 4. Vigil argues that, even when all the evidence presented at trial is considered in the light most favorable to the government, as the Court must, the facts of this case related to the NMSTO's attempt to engage in securities lending do not constitute a violation of the Hobbs Act. *See id.* at 2. Specifically, Vigil argues that he did not employ wrongful methods in his negotiations with Everage, *see id.* at 6, and that Everage never acquired a property interest from which to extort, *see id.* at 7. In addition, Vigil also argues, apparently in the alternative that, if the factual evidence does constitute a Hobbs Act violation, the United States did not prove that Vigil's conduct affected interstate commerce, as the Act requires, *see id.* at 13, and that conviction on the charges contained in Count Twenty–Four offends due process, because "[t]he Hobbs Act does not give fair warning that the facts of this particular count would violate its terms," *id.* at 15.

The United States contests each of Vigil's legal and factual arguments. First, the United States counters that Vigil's conduct was wrongful because Vigil had no lawful claim to the property that he demanded

Everage pay to Sais. *See* United States' Response to Defendant's Motion to Set Aside Verdict and for Judgment of Acquittal on Count 24 of the Fifth Superseding Indictment Under Fed.R.Crim.P. 29 or in the Alternative for a New Trial on Count 24 at 9, filed October 19, 2006 (Doc. 413)("United States Response"). Second, the United States asserts that Everage had acquired a property interest in the proceeds Everage expected the SLOM position to generate, in the right to compete for government contracts on a level playing field, and in the right to conduct his business affairs free of coercion, and that to sustain a conviction under the Hobbs Act, "a victim need only fear that he or she may suffer an economic loss if the demands of the corrupt public official are not met." *Id.* at 18. Third, the United States contends that it proved that Vigil's conduct affected interstate commerce—pointing out that "[s]ecurities lending involves, by its very nature, transactions based upon securities, which are themselves instrumentalities of interstate commerce." *Id.* at 20. Finally, the United States maintains that the facts of this case fall squarely within the scope of conduct the Hobbs Act prohibits and that the Hobbs Act provides adequate warning that the conduct in which Vigil engaged was illegal. *See id.* at 21.

In addition to its legal and factual arguments, the United States alleges that Vigil has previously raised, and that the Court has previously rejected, each of the arguments Vigil raises in this motion. The Court acknowledges that each of the arguments was raised in some form at the conclusion of Vigil's first and second trials. *See* Defendant Robert Vigil's Motion to Dismiss Racketeering Acts Five Through Twenty–Six and Counts Seven Through Twenty–Eight of the Fourth Superceding Indictment Under Fed.R.Evid. 29 at 7–9, filed May 10, 2006 (Doc. 196); Defendant Robert Vigil's Reply in Support of Motion

to Dismiss Racketeering Acts Five Through Twenty–Six and Counts Seven Through Twenty–Eight of the Fourth Superseding Indictment Under Fed.R.Evid. 29 at 2–7, filed June 21, 2006 (Doc. 239); Transcript of Trial at 137:1–140:18 (Bowles)(taken September 28, 2006). On August 7, 2006, the Court issued a Memorandum Opinion denying Vigil's request to dismiss the attempted extortion charge in the face of arguments substantially similar to the ones Vigil presents in support of this motion. *See* Memorandum Opinion at 19–26, filed August 7, 2006 (Doc. 268). At the December 1, 2006 hearing on this motion, Vigil's counsel did not contend that any of his arguments in support of this motion were entirely new, but maintained that, in the face of additional evidence and more precise presentation, they are now more fully developed. *See* Transcript of Hearing at 115:12–116:12 (Bowles)(taken December 1, 2006)("Hearing Transcript").

In any case, the Court has carefully reviewed each argument in the context of the fully developed trial record and has continued to study additional law, and finds that a reasonable jury could conclude the evidence presented at trial constitutes a violation of the Hobbs Act as a matter of law. In addition, the Court finds that there is sufficient evidence in the record for a reasonable jury to conclude that securities lending involves interstate commerce. Finally, the Court finds that sustaining Vigil's conviction will not offend due process. The Court will deny Vigil's motion.

## I. THE JURY'S VERDICT IS NOT LEGALLY AMBIGUOUS REGARDING THE THEORY UPON WHICH THE JURY PREMISED VIGIL'S CONVICTION, AND THE EVIDENCE IS SUFFICIENT TO SUSTAIN HIS CONVICTION.

Vigil states that the United States charged two alternate theories of extortion in Count Twenty–Four: "by threat of economic harm and under color of official right." Motion to Acquit at 10. Vigil suggests that, because no special interrogatories were used to determine which theory the jury premised its conviction, if there is insufficient evidence for either one of these theories, the verdict is ambiguous, and the Court must award Vigil a new trial. *See id.* (citing *United States v. Garcia*, 907 F.2d 380, 381 (2d Cir.1990)). Vigil maintains that the evidence was insufficient for the jury to reach a guilty verdict under either theory. *See id.*

The United States agrees with Vigil that Count Twenty–Four charges attempted extortion through two alternative methods—by use and threat of economic harm and through actions under color of official right—and acknowledges that no special verdict was employed to determine which theory the jury used to reach its conclusion. *See* United States' Response at 7. The United States counters, however, that in cases where a special verdict is not used, "a general verdict stands if the evidence is sufficient as to any one of the alternate theories of prosecution," and that Vigil's failure to make a timely challenge to his indictment on duplicity grounds waives a current challenge to the failure to use a special verdict. *Id.*

The Court finds that the jury was properly charged as to the elements of a Hobbs Act violation and was entitled to return a verdict on either or both of the alternate theories presented. The Court also believes that, by failing to make a timely request for a special verdict regarding which theory the jury was premising its conviction, Vigil has waived his right to contest the ambiguity of the general verdict that the jury returned. Finally, the Court concludes that the use of a special

verdict was not necessary because the evidence was sufficient to find Vigil guilty under either theory the government presented.

### A. THE JURY WAS ENTITLED TO FIND VIGIL GUILTY ON ANY OF THE ALTERNATIVE ELEMENTS OF A HOBBS ACT VIOLATION DESPITE COUNT TWENTY–FOUR'S CONJUNCTIVE PHRASING.

The Court begins its analysis by noting that the Hobbs Act's definition of "extortion" is written in the disjunctive—encompassing the taking of property "by wrongful use of actual or threatened force, violence, or fear, *or* under color of official right." 18 U.S.C. § 1951(b)(2) (emphasis added). This language appears to support the parties' contention that Count Twenty–Four charges extortion by alternate means. The Court notes, however, that Count Twenty–Four of the United States' Fifth Superceding Indictment, unlike 18 U.S.C. § 1951(b)(2), is worded in the conjunctive. Paragraph two of Count Twenty–Four charges that Vigil attempted to cause Everage to provide money to Sais "by wrongful use and threat of use of economic harm *and* under color of official right." Fifth Superceding Indictment, Count Twenty–Four ¶ 2, at 31, filed July 25, 2006 (Doc. 259)(emphasis added).

Unlike the language of the Indictment, the Court's jury instructions related to Count Twenty–Four tracked the language of the statute and charged the jury that they could find Vigil attempted to extort Everage "either (a) by wrongful use of actual or threatened fear, or (b) under color of official right." Court's Final Jury Instructions with Citations, Instruction No. 31, at 68, filed September 28, 2006 (Doc. 394)("Jury Instructions"). On the other hand, the verdict form presented to the jury required that the jury find Vigil

guilty or not guilty "as charged in Count Twenty–Four of the indictment." Verdict at 5, filed September 30, 2006 (Doc. 408).

Because Vigil focuses on the alternate methods through which a defendant may violate the Hobbs Act, he does not argue, and the Court does not believe, that these inconsistencies undermine Vigil's conviction. The Tenth Circuit has described it as "hornbook law that a crime denounced in the statute disjunctively may be alleged in an indictment in the conjunctive, and thereafter proven in the disjunctive." *United States v. Powell,* 226 F.3d 1181, 1192 (10th Cir.2000)(quoting *United States v. Gunter,* 546 F.2d 861, 868–69 (10th Cir.1976)). *See United States v. Lott,* 310 F.3d 1231, 1246 (10th Cir.2002)(reviewing the sufficiency of evidence to see if either alternate theory would have supported a conviction in a case in which the indictment was worded in the conjunctive and the charging statute was worded in the disjunctive). Other Circuit Courts of Appeals that have considered this issue are in accord. *See United States v. Coriaty,* 300 F.3d 244, 250 (2d Cir.2002)("The general rule is that when a jury returns a guilty verdict on an indictment charging several acts in the conjunctive, ... the verdict stands if the evidence is sufficient with respect to any one of the acts charged.")(quoting *Turner v. United States,* 396 U.S. 398, 420, 90 S.Ct. 642, 24 L.Ed.2d 610 (1970)); *United States v. Arlt,* 15 Fed.Appx. 431, 436 (9th Cir.2001)(indicating that the district court's jury instructions "property tracked the language of the statute" and holding "[a] jury may convict on a finding of any of the elements of a disjunctively defined offense, despite the grand jury's choice of conjunctive language in the indictment"); *United States v. Poarch,* 878 F.2d 1355, 1358 (11th Cir.1989)(stating that, when a criminal statute provided for alternate means of

violation, and the grand jury returned an indictment with conjunctive language, "the government obtained a more difficult indictment that it was required to by the statute," and "the government need only show that one of those acts was committed in order to prove guilt"). Thus, that the jury may have found Vigil guilty based on one alternative theory, when the United States charged in the conjunctive, does not violate Vigil's Sixth Amendment right to unanimity.

The Court acknowledges that the verdict form that the jury filled out directed the jury to find Vigil guilty or not guilty "as charged in Count Twenty–Four of the indictment." Verdict at 5. The Court assumes, however, that the jury was cognizant of and followed the jury instructions. *See Reed v. Landstar Ligon, Inc.*, 314 F.3d 447, 454 (10th Cir.2002)("We presume the jury followed the district court's instructions."). In any case, for three reasons, the Court does not believe that the direction contained in the verdict form changes its result. *Cf. United States v. Brown*, 330 F.3d 1073, 1077 (8th Cir.2003)(stating that "we are aware of no case in which a verdict form by itself was held to constitute a constructive amendment" to an indictment).

First, the Court instructed the jury that the Fifth Superceding Indictment was only the formal charge against Vigil and was not evidence of his guilt. *See* Jury Instructions, Instruction No. 19, at 23. Second, because of the indictment's length, the Court did not read it to the jury, nor absolutely require that the jury read the indictment. *See id.* Rather, the Court's instruction stated: "I urge each of you to carefully read the Indictment as you begin your deliberations in this case." *Id.* Third, and most important, if the jury followed the verdict form to the letter, disregarding the Court's alternative phrasing in Instruction No. 31 and analyzing Count Twenty–Four's elements conjunctively, a presumption the Court declines to reach, the verdict certainly is not ambiguous. Under that scenario, the jury would have found Vigil guilty of attempted extortion because he threatened Everage with economic harm *and* because he acted under color of official right. And, as the Court concludes herein, the evidence is sufficient to sustain the verdict under both theories. *See* discussion *infra* Part I.C.

**B. THE LACK OF A SPECIAL VERDICT DOES NOT INVALIDATE VIGIL'S GENERAL VERDICT ON GROUNDS OF AMBIGUITY.**

Vigil points out that no special interrogatories were submitted to the jury to establish under which theory it found Vigil guilty, and "[c]onsequently[,] if there was insufficient evidence for one of these theories, then the verdict is ambiguous and a new trial must be granted." Motion to Acquit at 10 (quoting *United States v. Garcia*, 907 F.2d at 381). The United States' counters that, because Vigil failed to make a timely request for a special verdict, he may not now challenge his indictment on duplicity grounds or question the unanimity of the jury's verdict with respect to either of the alternative theories presented. *See* United States' Response at 7–8. The United States further contends that Vigil's citation of *United States v. Garcia* cannot withstand judicial scrutiny, because the Supreme Court, in *Griffin v. United States*, has "expressly disapproved" of the United States Court of Appeals for the Second Circuit's holding in *United States v. Garcia*. *See* United States' Response at 8 (citing *Griffin v. United States*, 502 U.S. at 57–58 n. 2, 112 S.Ct. 466).

The Court notes that *United States v. Garcia*, although a persuasive appellate

authority, is not binding precedent for courts in the Tenth Circuit. The Court also agrees with the United States that the Supreme Court's decision in *Griffin v. United States* casts doubt on the validity of the Second Circuit's essential holding in *United States v. Garcia.* Indeed, the Second Circuit has acknowledged that *Griffin v. United States* "effectively overruled" its decision in *United States v. Garcia. United States v. Mulder,* 273 F.3d 91, 115 (2d Cir.2001). Finally, at the hearing on this motion, Vigil's counsel acknowledged that the Supreme Court had overruled *United States v. Garcia* to the extent that the Second Circuit's result invalidated a general verdict even when the evidence was sufficient to support a conviction premised on either alternative ground. *See* Hearing Transcript at 37:15–18 (Bowles).

The petitioner in *Griffin v. United States,* Diane Griffin, along with two co-conspirators, was charged with conspiracy to defraud the federal government in violation of 18 U.S.C. § 371. *See* 502 U.S. at 47, 112 S.Ct. 466. The conspiracy was alleged to have two objects: (i) impairing the IRS' efforts to calculate income taxes; and (ii) impairing the Drug Enforcement Administration's ("DEA") efforts to ascertain forfeitable assets. *See id.* At trial, evidence was presented connecting Griffins' co-conspirators to both objects and implicating Griffin in the IRS scheme, but no evidence was presented connecting her to the DEA object. *See id.* at 47–48, 112 S.Ct. 466. The district court denied Griffin's request for severance and special interrogatories, and charged the jury with an instruction that allowed it to convict Griffin if it found the evidence sufficient to connect her to either one of the conspiracy's alleged objects. *See id.* at 48, 112 S.Ct. 466. The jury returned a general guilty verdict against all three conspirators. *See id.*

In affirming Griffin's conviction, the Supreme Court characterized it as well settled law that "a general jury verdict was valid so long as it was legally supportable on one of the submitted grounds—even though that gave no assurance that a valid ground, rather than an invalid one, was actually the basis for the jury's action." *Id.* at 49, 112 S.Ct. 466. Moreover, as a matter of historical practice, this rule applied to "general verdicts returned on multicount indictments where some of the counts were unsupported by the evidence . . . [and to] a general jury verdict under a *single* count charging the commission of an offense by two or more means." *Id.* at 50, 112 S.Ct. 466 (internal citations omitted)(emphasis in original). Acknowledging case law that had invalidated convictions involving general verdicts when one of the alternate grounds for conviction was unconstitutional, or otherwise illegal, the Supreme Court expressly refused to expand that jurisprudence to encompass cases where one of the alternate grounds was "merely unsupported by sufficient evidence." *Id.* at 56, 112 S.Ct. 466. Rather, the Supreme Court reaffirmed the traditional rule that, "[w]hen a jury returns a guilty verdict on an indictment charging several acts in the conjunctive, . . . the verdict stands if the evidence is sufficient with respect to any one of the acts charged." *Id.* at 56–57, 112 S.Ct. 466.

 Vigil has not alleged, and the Court does not believe, that either alternate ground upon which his conviction may have been premised is unconstitutional, or otherwise illegal. Nor did he request the Court use special interrogatories to ascertain the precise basis for his guilt. Accordingly, consistent with the Supreme Court's ruling in *Griffin v. United States,* the lack of a special verdict does not make Vigil's conviction ambiguous, and the conviction must be sustained if the evidence is

sufficient with respect to either of the acts charged.

The Court's holding is also consistent with Tenth Circuit caselaw since *Griffin v. United States.* In *United States v. Haber,* the defendant challenged his conviction because the district court's jury instructions permitted the jury to find him guilty of mail fraud "based upon *either* a scheme to defraud *or* a scheme to obtain money by false pretenses." 251 F.3d at 888 (emphasis in original). Unlike Vigil, the defendant in *United States v. Haber* had requested a jury instruction explaining that the jury must unanimously agree as to the specific basis for conviction, but the district court refused "because the jury instructions already included a general exhortation that the verdict must be unanimous in order to convict." *Id.* Citing *Griffin v. United States* as support for its holding, the Tenth Circuit in *United States .v. Haber* recognized that, "[i]n some circumstances, 'a defendant can raise a late challenge to a duplicitous indictment if cause is shown that might justify the granting of relief from the waiver,'" but found no such circumstances applied in that case. *United States v. Haber,* 251 F.3d at 889 (quoting *United States v. Trammell,* 133 F.3d at 1354).

The Court finds the Tenth Circuit's holding in *United States v. Haber* instructive. Like the mail fraud charge against the defendant in *United States v. Haber,* Count Twenty–Four charges Vigil with one substantive crime provable under alternate methods of completion. Like the district court in *United States v. Haber,* the Court provided the jury with a general exhortation that to reach a verdict, it must reach a unanimous agreement on each count of the indictment. *See United States v. Sasser,* 971 F.2d at 477 ("[A] general instruction on the requirement of unanimity suffices to instruct the jury that

they must be unanimous on whatever specifications they find to be the predicate of the guilty verdict."); Jury Instructions, Instruction No. 39, at 79. Finally, the Tenth Circuit in *United States v. Haber* drew support for its result on its conclusion that the United States had presented sufficient evidence to establish both alternative offenses of a scheme to defraud and a scheme to obtain money by false pretenses. *See* 251 F.3d at 889. Similarly, the Court believes that the evidence presented at Vigil's trial was sufficient for a reasonable jury to find him guilty beyond a reasonable doubt under both theories the United States' posited. *See* discussion *infra* Part I.C.

**C. THE EVIDENCE WAS SUFFICIENT FOR A REASONABLE JURY TO REACH A CONVICTION BASED ON EITHER ALTERNATE THEORY.**

▮ Vigil contends that the evidence the United States presented was insufficient to constitute a violation of the Hobbs Act under both the threat-of-economic-harm and under-color-of-official right theories. *See* Motion to Acquit at 10. In support of his conclusion, Vigil cites the Second Circuit's decision in *United States v. Garcia* for the proposition that "when a 'victim' is a willing participant in order to materially benefit from some alleged extortion, the 'victim' is not acting out of fear, but rather out of a desire to improve its bottom line." Motion to Acquit at 11. Because the Court believes that the facts of this case are distinguishable from those in *United States v. Garcia,* and because the Court believes that, consistent with more recent federal appellate precedent, the evidence was sufficient for a reasonable jury to find that Vigil threatened Everage with economic harm and acted under color of official right, the Court disagrees

with Vigil and finds that there was sufficient evidence to sustain his conviction.

### 1. *"Wrongful" Conduct.*

Vigil states that "[t]he core of the Hobbs Act that separates lawful from unlawful conduct is that the alleged act of extortion must be 'wrongful.'" Motion to Acquit at 5. Because Congress has not expressly defined "wrongful" in 18 U.S.C. § 1951, Vigil cites the Anti-Racketeering Act of 1934 for the proposition that "'wrongful' means in violation of the criminal laws of the United States or of any State or Territory," Motion to Acquit at 5 (quoting 48 Stat. 979, 980), and *Black's Law Dictionary* as defining "wrongful" as "contrary to law." Motion to Acquit at 5 (citing *Black's Law Dictionary* 1606 (7th ed.1999)). Vigil does not cite, however, any authority indicating that Congress intended either of these definitions to apply to the term "wrongful" under the Hobbs Act. Indeed, at the hearing on this motion, Vigil's counsel seemed to distance himself from this assertion and stated that, "to be wrongful, [a defendant has] to obtain something to which [he's] not entitled." Hearing Transcript at 18:21–23 (Bowles).

Vigil's counsel's statement is consistent with the Supreme Court's conclusion in *United States v. Enmons*, 410 U.S. 396, 93 S.Ct. 1007, 35 L.Ed.2d 379 (1973), that "'wrongful' has meaning in the [Hobbs] Act only if it limits the statute's coverage to those instances where the obtaining of the property would itself be 'wrongful' because the alleged extortionist has no lawful claim to that property." 410 U.S. at 400, 93 S.Ct. 1007. Nevertheless, in his memorandum in support of this motion, Vigil combines, without explication, the definitions he cites with the Supreme Court's language in *United States v. Enmons* and concludes that "to be 'wrongful' the act attempted or carried out must be in violation of the criminal laws of the United States or a State and the alleged extortion-

ist must have no lawful claim to the 'property' at issue." Motion to Acquit at 5.

The United States disputes Vigil's interpretation of the meaning of "wrongful" and argues that the Hobbs Act's legislative history "makes clear that Congress intended the Hobbs Act to have a broader scope than the Anti-Racketeering Act of 1934." United States' Response at 11. The United States cites to *Scheidler v. National Organization for Women, Inc.*, 537 U.S. 393, 123 S.Ct. 1057, 154 L.Ed.2d 991 (2003)(*"Scheidler II"*), and *Evans v. United States*, as cases in which the Supreme Court acknowledged that Congress passed the Hobbs Act because of its dissatisfaction with the Supreme Court's restrictive construction of the activities that were criminal under the Anti-Racketeering Act of 1934. *See* Motion to Acquit at 11; *Scheidler II*, 537 U.S. at 407, 123 S.Ct. 1057 (noting that the "Hobbs Act was subsequently enacted to supercede the Anti-Racketeering Act and reverse the result in [*United States v. Local 807 of Int'l Bhd. of Teamsters*, 315 U.S. 521, 62 S.Ct. 642, 86 L.Ed. 1004 (1942)]"); *Evans v. United States*, 504 U.S. at 262, 112 S.Ct. 1881 ("[The Hobbs Act] was intended to encompass the conduct held to be beyond the reach of the [Anti-Racketeering Act of 1934] by our decision in *United States v. Teamsters.*").

■■■■ The Court finds the United States' argument persuasive and believes that, to the extent that Vigil continues to argue that a defendant's actions must be contrary to federal or state law to constitute a violation of the Hobbs Act, he has misunderstood the law. Rather, the Court understands the term wrongful to apply to scenarios where a defendant employs, or attempts to employ, one of the extortion methods enumerated in 18 U.S.C. § 1951(b)(2) and has no lawful claim to the property that is the subject of the extor-

tion (or, in the case of an attempt, the attempted extortion).

Perhaps because Vigil's motion does not argue that the evidence at trial was insufficient to find him guilty of extortion based on the "under-color-of-official-right" theory, *see* discussion *infra* Part I.C.3, both Vigil and the United States appear to limit the application of their "wrongful" conduct arguments to the "fear-of-economic-harm" theory. The United States cites *United States v. Enmons* for the proposition that " 'wrongful' does not appear to apply to the 'under color of official right' portion of the definition." United States' Response at 9 (citing *United States v. Enmons*, 410 U.S. at 399, 93 S.Ct. 1007). The Supreme Court in *United States v. Enmons* appears to limit its analysis regarding the meaning of "wrongful" to the first subset of methods in which the Hobbs Act can be violated—"actual or threatened force, violence, or fear." *See* 410 U.S. at 399, 93 S.Ct. 1007; 18 U.S.C. § 1951(b)(2). Nevertheless, because the Supreme Court has more recently stated that a public official is guilty of extortion pursuant to the under-color-of-official-right theory when that "public official has obtained a payment to which he was not entitled," the Court believes the distinction is immaterial. *Evans v. United States*, 504 U.S. at 268, 112 S.Ct. 1881. The Court concludes that the term "wrongful" applies when a defendant attempts to extort property to which he has no lawful claim—irrespective of the extortion method employed—and, because Vigil's claim to the property interests in this case are identical under either theory on which the jury may have premised his conviction, the jury was entitled to consider his conduct "wrongful." [2]

As a supplemental argument, Vigil contends that his actions are not wrongful, because they cannot be characterized as anything more than "hard bargaining"—activity that the Hobbs Act does not criminalize. *See* Motion to Acquit at 6 (citing *Capo I*, 791 F.2d at 1062–63).[3] Vigil asserts that, as State Treasurer, he had the authority to decide whether, and on what terms, to create the SLOM position, and that he was entitled to create the position

---

**2.** The Court notes that its instructions to the jury were consistent with this finding. With regard to the "fear of economic loss or harm" theory, the Court instructed the jury that " '[w]rongful' means that Mr. Vigil had no lawful right to obtain the property in that way." Jury Instructions, Instruction No. 31, at 68. With regard to the "under color of official right" theory, the Court instructed the jury that "[t]o 'wrongfully obtain property under color of official right' means the taking or attempted taking by a public officer of property not belonging or owed to him or his office, whether or not the public official employed fear." *Id.*, Instruction No. 31, at 69–70. The Court's definitions substantially track the Tenth Circuit's Criminal Pattern Jury Instructions 2.70 and 2.71. *See* Tenth Circuit Criminal Pattern Jury Instruction 2.70, Extortion by Force Violence or Fear, at 230 (2005); Tenth Circuit Criminal Pattern Jury Instruction 2.71, Extortion Under Color of Official Right, at 232 (2005). Neither party made an objection to these instructions.

**3.** The United States criticizes Vigil's citation of *Capo I*, noting that the Second Circuit, sitting *en banc*, reversed the convictions that *Capo I* upheld. *See United States v. Capo*, 817 F.2d 947 (2d Cir.1987)(en banc)(*"Capo II"*). The Second Circuit in *Capo II* did not hold that hard bargaining was criminal, however, to the contrary, it reversed the defendants' Hobbs Act convictions—upheld in *Capo I*— because it found the evidence was insufficient to demonstrate that the victims had any fear of economic loss. *See Capo II*, 817 F.2d at 954. In any case, more recent federal appellate cases continue to recognize that the Hobbs Act does not prohibit "hard bargaining." *Brokerage Concepts, Inc. v. U.S. Healthcare, Inc.*, 140 F.3d at 523–24 ("What the Act reaches is not mere hard bargaining but the exploitation of the fear of economic loss in order to obtain property to which the exploiter is not entitled.").

in the manner he felt would be most advantageous to the NMSTO; he argues that those terms do not become criminal because Everage did not agree to them. *See* Motion to Acquit at 6–7. Vigil argues that, as State Treasurer, "he had every lawful right to suggest modifications of the terms of the contract or to ask Mr. Everage to work out a compensation arrangement with another employee." *Id.* at 6. To the extent that Vigil's proposed terms might have violated the provision against subcontracting contained in the RFP, Vigil concedes that such terms may have been grounds for a breach of contract action, but he asserts they were in no way criminal. *See id.*

The United States characterizes this argument as "inapposite" and counters that Vigil's actions remain "wrongful" because he had no lawful claim to the property for which he was bargaining. *See* United States' Response at 13. The United States contends that "[t]he only legitimate bargaining in which [Vigil] could have engaged would have been on behalf of the people of New Mexico, not on behalf of the wife of his criminal associate[,] Michael Montoya." *Id.* The United States explains that, had Vigil "attempted to bargain down Everage's overall level of compensation, with the benefits running to the State of New Mexico, [Vigil's] argument might have been persuasive." *Id.*

There is sufficient evidence in the trial record for a reasonable jury to find beyond a reasonable doubt that Vigil was not concerned with negotiating the fee structure, or the mechanism through which the SLOM was paid, to limit the NMSTO's costs associated with securities lending. Indeed, the evidence was limited to his attempt to shift a portion of the fees securities lending generated—in whatever amount they may have resulted—to Sais. Moreover, at this point in the proceedings, the Court must evaluate the evidence in the light most favorable to the United States. Irrespective of Vigil's theory at trial, the Court believes that the jury was free to disregard Vigil's "hard bargaining" analysis and conclude that his actions were an attempt to extort from Everage some portion of the fees that he would have earned through his performance of the SLOM contract. Because Vigil would not have a lawful claim in any monies Everage earned in this manner, the Court finds that the evidence was sufficient for a reasonable jury to find beyond a reasonable doubt that Vigil's conduct was wrongful.

### 2. *Threat of Economic Harm.*

The defendants in *United States v. Garcia*, Robert Garcia, a Congressman from New York City, and his wife, Jane Garcia, were accused of engaging in two allegedly extortionate acts involving threat of economic harm. First, at a dinner with Mario Moreno, an officer at the Wedtech Corporation, the Garcias were alleged to have made references to Robert Garcia's influence in Congress as well as to the couple's access to top officials at the United States Navy and United States Postal Service. *See* 907 F.2d at 383. The Garcias were aware that Wedtech was having problems performing under a multimillion dollar contract to build pontoon boats for the Navy, and that the company was attempting to obtain postal contracts. *See id.* During the dinner, Robert Garcia suggested to Moreno that Wedtech hire Jane Garcia as a public relations consultant; when he refused—because he "had no need for a public relations consultant"—Jane Garcia persisted and suggested that she could be paid through an intermediary friend of the Garcias. *Id.* Subsequent to this dinner conversation, Moreno sought and received the approval of such a payment from the Wedtech officers. *See id.*

The second extortionate act involved a $20,000.00 loan Moreno arranged from the Wedtech "slush fund" to the Garcias. *Id.* at 384. Moreno testified at trial that it was his understanding this loan was necessary for Wedtech to continue receiving Robert Garcia's assistance. *See id.* Before repaying the loan—approximately five months late—Robert Garcia asked Moreno to convert the loan into a donation to his sister's church; Moreno declined, but indicated that he might make a donation to the church at a later time. *See id.*

The Second Circuit in *United States v. Garcia* declined to characterize either one of these transactions as extortion by wrongful use of economic fear. In reaching this finding, the Second Circuit relied on its earlier ruling in *United States v. Capo,* 817 F.2d 947 (2d Cir.1987)(en banc)("*Capo II*"), a case that involved a job-selling scheme at the Eastman Kodak Company ("Kodak"). *See* 817 F.2d at 948. In the wake of an announcement that Kodak had an urgent need for additional employees, the defendants in *Capo II* allegedly used their influence with a hiring official at Kodak to secure preferential hiring treatment for individuals who made payments to the defendants. *See id.* at 949. The Second Circuit acknowledged that the defendants' conduct may have constituted bribery, but held that, as a matter of law, it could not be considered extortion, because there was "no evidence ... that the 'victims' were coerced or threatened by [the] defendants, and all the evidence points to the conclusion that they paid voluntarily to improve their chances to get jobs they had not been able to obtain on their own." *Id.* at 954.

Consistent with its opinion in *Capo II,* the Second Circuit in *United States v. Garcia* pointed to evidence that, during the dinner at which Moreno and the Garcias discussed Wedtech's contract with the Navy and potential contracts with the Postal Service, Moreno did not perceive the Garcias' comments as threatening and, to the contrary, postulated that the Garcias could be influential allies. *See id.* at 383. The Second Circuit in *United States v. Garcia* characterized Wedtech's actions as buying influence—as opposed to capitulating to extortionate demands—and noted that, "even in the face of Garcia's disgraceful request for money, Wedtech was not risking the loss of anything to which it was legally entitled." *Id.* at 383–84. Moreno's refusal to convert the $20,000.00 loan into a donation affirmed the Second Circuit's conviction, because "[h]ad Garcia actually established a climate of fear ... Wedtech would not have refused Robert Garcia's request that Wedtech convert its loan into a 'donation.'" *Id.* at 384.

Disregarding the possibility that *United States v. Garcia* is no longer good law, the Court believes the important distinction between the payments the "victims" made to the defendants in *Capo II,* the payments Wedtech made to Garcia in *United States v. Garcia,* and the extortionate demands Vigil made of Everage is the victim's right to the property extorted. In finding that the Garcias' conduct did not violate the Hobbs Act, the Second Circuit in *United States v. Garcia* stated that what the evidence at trial proved was that "Wedtech paid the Garcias in the hope of receiving future favors, it did not establish that the company acted out of fear that without these payments it would lose existing contracts or even opportunities to which it was legally entitled." 907 F.2d at 385. The Second Circuit reasoned that Wedtech paid the Garcia's out of its desire for preferential treatment, and not from fear of losing something to which it had a legal claim. *See id.* at 384.

The United States contends that *United States v. Garcia* is also distinguishable because, unlike Wedtech and the Garcias, the

evidence presented at Vigil's trial suggested that Everage did not act complicity with Vigil. The United States notes that Everage repeatedly opposed hiring Sais. *See* Hearing Transcript at 73:7–10; 76:11–12 (Yarbrough). Everage indicated that he met with Sais on April 29, 2005 to discuss her professional qualifications, and that, based on that meeting, decided that he did not wish to hire her. *See* Everage Direct Examination at 53:8–14; 59:24–60:10. Accordingly, when Everage submitted a bid for the SLOM contract, on May 3, 2005, his bid did not include any role for Sais. *See id.* at 62:12–17. Everage acknowledged that he did eventually draft a memorandum of understanding between himself and Sais, and met with Sais a second time in an attempt to negotiate a fee-sharing arrangement, but was unable to come to a satisfactory arrangement. *See id.* at 102:7–9; 105:14–18. Everage testified that, after conveying his decision to Vigil, he believed Vigil threatened to cancel his contract with the NMSTO if Everage and Sais could not resolve their disagreement. *See id.* at 111:11–12; 112:9–12; Everage Cross–Redirect at 80:4–7.

The Court finds the United States' distinction argument persuasive and believes that the facts in Vigil's case are more closely aligned to those that the United States Court of Appeals for the Sixth Circuit addressed in *United States v. Collins,* 78 F.3d 1021 (6th Cir.1996). In *United States v. Collins,* the Sixth Circuit affirmed the conviction of Billy Louis Collins, the husband of the governor of Kentucky, who had been convicted of conspiracy to violate the Hobbs Act. During an eight-week trial, the United States had presented evidence that Collins and his co-conspirators solicited contributions from private parties and businesses, for personal and political causes, in exchange for the right to contend for state contracts, including bond-underwriting con-

tracts. *See id.* at 1026. In addition to general evidence demonstrating a scheme based on payments for access to government business—the primary investment bank involved in the scandal had never previously done business as a bond underwriter with Kentucky—the "evidence of awards of government contracts to contributors was balanced by evidence of the denial of contracts to those who refused to contribute." *Id.* at 1029. The Sixth Circuit in *United States v. Collins* acknowledged the Second Circuit's holding in *United States v. Garcia,* but determined that the payments that contributors made in *United States v. Collins* were not attempts to purchase influence, but rather were made "out of fear that without the payments they could lose the opportunity to compete for government contracts on a level playing field, an opportunity to which they were legally entitled." *Id.* at 1031.

Similar to the contributors in *United States v. Collins,* Everage testified that he was aware that he did not have an absolute right to the SLOM contract, but that, based on his conversation with Vigil subsequent to his first meeting with Sais, it became his understanding that, if he did not hire Sais, he would not be *considered* for the SLOM position. *See* Everage Direct Examination at 61:8–9. Consequently, like the contributors in *United States v. Collins,* Everage was willing to direct some money to Sais—at Vigil's direction—because he felt that, if he did not, he would have no opportunity to be awarded the SLOM contract. *See* Everage Direct Examination at 82:5–7. As further reinforcement of this conclusion, Everage testified that, when he later informed Vigil, during a June 13, 2005 phone call following his second meeting with Sais, that he could not employ Sais, Vigil told him that he was having Gallegos draft a letter to cancel the

SLOM contract between Everage and the NMSTO. *See id.* at 111:11–12.

The Court believes that these facts reflect more than just Everage's attempt to purchase influence; Vigil's actions were an attempt to compel Everage to part with proceeds he would have earned in the SLOM position by causing him to fear that, if he did not, he would lose his opportunity to compete in the SLOM bidding process. The SLOM was to be selected pursuant to a bidding process executed through the issuance of a RFP. *See id.* at 43:6–16. Everage, like any other investment manager that might submit a bid, had a legal entitlement to be considered on a level-playing field, and without coercion.

### 3. *Under Color of Official Right.*

Because Vigil asserts that, under *United States v. Garcia,* there was insufficient evidence for the jury to convict him under the threat-of-economic-harm theory, and that, because the jury was not presented with a special interrogatory to determine upon which premise it based its guilty verdict, his conviction is ambiguous, he does not address the applicability of the under-color-of-official-right theory. The United States argues that the evidence presented at trial was sufficient to support a guilty verdict based on the under-color-of-official-right theory. Specifically, the United States contends that Vigil attempted to obtain property, and distribute it to Sais, and that the property and corresponding right to distribute it did not belong to him and was not owed to him or his office. *See* United States' Response at 10.

■ A public official commits extortion "under color of official right" when that "official has obtained a payment to which he was not entitled, knowing that the payment was made in return for official acts." *Evans v. United States,* 504 U.S. at 268, 112 S.Ct. 1881. Vigil does not dispute that he did not attempt to hire Sais as a NMSTO employee or intend to compensate her for work related to the securities-lending project with state funds. Indeed, Everage testified that he understood Vigil decided to issue a contract for the SLOM position, because the NMSTO did not have the budgetary resources to have an in-house employee devoted to securities lending. *See* Everage Direct Examination at 36:9–14. Rather, the SLOM was to be paid a fee calculated as a percentage of the value of securities that the NMSTO lent. *See* Everage Cross–Redirect at 35:17–23.

The Court agrees with the United States that these fees, once they were earned pursuant to work performed consistent with the terms of the SLOM contract as described in the RFP, would have been private property belonging to the SLOM. Neither Vigil, nor the NMSTO, would have had any entitlement to these funds or right to control their distribution. Conditioning the award of the SLOM contract—an official act—on a targeted distribution of some or all of these fees constitutes a violation of the Hobbs Act.

## II. *VIGIL ATTEMPTED TO EXTORT PROPERTY FROM EVERAGE.*

Vigil argues that, in addition to proving that he wrongfully attempted to obtain property from Everage, the United States was obligated to prove that Everage had obtained a property interest that Vigil could direct towards Sais. Vigil asserts that Everage never acquired more than "theoretical monies" and that such monies do not constitute property that can be extorted under the Hobbs Act. Motion to Acquit at 7. *See* Hearing Transcript at 19:10–11 (Bowles). Vigil points out that the SLOM position was not funded and asserts that no property interest could manifest until the NMSTO contracted with securities-lending agents to engage in securities lending—a step that was never

taken. *See* Motion to Acquit at 8. Vigil contends that, because Everage had no entitlement to payment, even under a signed contract for the SLOM position, he never acquired property that Vigil could extort. *See id.* Vigil concedes that, because the conviction at issue is for an attempt crime, "[i]t is true that the United States is not required to prove that property was *actually* extorted." *Id.* at 2 (emphasis in original). He asserts, however, that the United States must prove "that there was *actually something to extort* in the first place or there is simply no crime that could be committed." *Id.* (emphasis in original).

At the hearing on this motion, Vigil emphasized his point by stating that, because there was only a possibility that the SLOM would profit from the NMSTO's participation in securities lending, and not an assurance, the SLOM contract called for a unique legal analysis. *See* Hearing Transcript at 20:3–7 (Bowles). Vigil's counsel conceded that, if the SLOM contract had been for a fixed amount of money in exchange for acting as the SLOM, and a contract between the NMSTO and the SLOM was executed, an attempt to shift some of that money to a third person would be illegal under the Hobbs Act. *See id.* at 20:7–11 (Bowles). Under the facts of this case, however, Vigil argues that no property interest could have manifested until the securities-lending agents agreed to contract with the NMSTO and fee-generating trades were actually completed. *See id.* at 27:14–22 (Bowles). Vigil maintains that, "even if legally binding, [the SLOM contract] would have created no property interest standing alone." Motion to Acquit at 2.

The United States counters that, although the exact amount of money that Everage was to be paid was indeterminable, both Vigil and Everage expected the SLOM to earn income and that Vigil was attempting to shift a significant portion of that income to Sais. *See* United States' Response at 15; Hearing Transcript at 48:12–15; 49:5–6 (Yarbrough). The United States emphasizes that, while the amount of money Everage stood to gain was unclear, the jury heard evidence of several specific and fixed amounts that Vigil attempted to extort for Sais.

The United States further alleges that Everage had acquired a property right in the SLOM position, because Vigil "does not dispute ... that had Everage given in to [Vigil's] demands and agreed to pay Sais part of whatever money he received, Everage would have received the SLOM position." United States' Response at 16. The United States contends that a contractual entitlement to specific property is not a prerequisite to the manifestation of a property interest. *See* Hearing Transcript at 40:17–24; 43:4–8 (Yarbrough). The United States argues that, although intangible, Everage had a vested property right in a fair opportunity to compete for the SLOM position and in his authority to run his own business enterprise free from coercion. *See* Hearing Transcript at 49:17–21 (Yarbrough).

In addition, at the hearing on the motion, the United States argued that there was evidence that Vigil originally attempted to extort not an indefinite amount of money, but a fixed payment to Sais, regardless whether the SLOM ever generated any commission fees. *See id.* at 44:7–13 (Yarbrough). At the trial, Everage testified that, based on the evaluation he had done, he estimated that he could expect to earn approximately $105,450.00 per year as the SLOM. *See* Everage Cross–Redirect at 12:5–8. Everage testified that, when he first inquired what he would have to pay Sais, he was told he should expect to pay her between $500.00 and $1,000.00 per month. *See* Everage Direct Examina-

tion at 37:17–21. Everage stated, however, that "the pressure and the price was going up," and that the price eventually escalated to $16,000.00 per year. *Id.* at 41:19–20. Everage next told the jury that, at his first meeting with Sais, on April 29, 2005, Sais informed him that she was expecting her compensation to be $55,000.00 per year. *See id.* at 55:12–14. Finally, evidence was presented that the memorandum of understanding that Everage drafted, but which he and Sais never endorsed, provided for Sais to receive the lesser amount of forty percent of Everage's net earnings from securities lending or $45,000.00 per year. *See* Everage Cross-Redirect at 26:18–24. The United States asserts that each of these amounts constitutes a fixed, certain property interest that Vigil attempted to extort from Everage and direct to Sais. *See* Hearing Transcript at 47:2–4 (Yarbrough).

 The Court acknowledges the United States' first argument, but notes that, despite discussion of these figures, at no point did Everage and Sais ever reach an agreement on the amount Sais was to be compensated. In fact, Everage indicated that, after both meetings with Sais, he resolved not to hire her. Given the tenuous nature of the negotiations between Sais and Everage, the Court is not convinced that a property interest, consisting of a fixed, certain amount of money, ever existed for which Vigil could extort Everage. In any case, because the Court does not believe the existence of definite, tangible property is necessary to sustain an attempted extortion conviction under the Hobbs Act, the Court need not decide that question for the purposes of this motion.

Vigil cites to *Cleveland v. United States,* 531 U.S. 12, 121 S.Ct. 365, 148 L.Ed.2d 221 (2000), as support for his contention that theoretical monies do not constitute "property" for the purposes of a Hobbs Act conviction. *See* Motion to Acquit at 7. In *Cleveland v. United States,* however, the Supreme Court did not construe the Hobbs Act, but 18 U.S.C. § 1341, the mail fraud statute which proscribes use of the mail in "any scheme or artifice to defraud, or for obtaining money or property." 18 U.S.C. § 1341; *Cleveland v. United States,* 531 U.S. at 15, 121 S.Ct. 365. The defendant in *Cleveland v. United States* had been accused of fraudulently using the mail to assist in obtaining state licenses to operate video poker machines from the State of Louisiana. *See* 531 U.S. at 15–17, 121 S.Ct. 365. The Supreme Court, in a unanimous opinion authored by Justice Ginsburg, reversed the defendant's conviction and held that the mail fraud statute "does not reach fraud in obtaining a state or municipal license of the kind here involved, for such a license is not 'property' in the government regulator's hands." *Id.* at 20, 121 S.Ct. 365.

Contrary to the inference Vigil wishes the Court to draw, however, the Supreme Court did not rule that the licenses could not constitute property; rather, the Supreme Court in *Cleveland v. United States* considered the more limited question whether state licenses to operate video poker machines were property in the hands of the State. *See id.* at 20, 121 S.Ct. 365. The Supreme Court asserted that Louisiana's interests in the machines were regulatory, not property, interests. *See id.*

The United States argues that *Cleveland v. United States* is also distinguishable because that case involved licenses and the object of the attempted extortion in Vigil's case was money. *See* United States Response at 15. The United States represents that it is unaware of any case in which a court held that money is not property. *See id.* The Court finds this argument persuasive and notes that the Supreme Court seemed to make a similar

distinction in *Cleveland v. United States.* In delineating the distinction between a regulatory and a property interest, the Supreme Court observed that the "the Government nowhere alleges that [the defendant] defrauded the State of any money to which the State was entitled by law ... [and] there is no dispute that [the defendant] paid the State of Louisiana its proper share of revenue [the video poker machines generated]." 531 U.S. at 22, 121 S.Ct. 365.

In *United States v. Mitov,* 460 F.3d 901 (7th Cir.2006), the United States Court of Appeals for the Seventh Circuit recently addressed a very similar issue to the one facing the Court. The defendant in *United States v. Mitov* was the former caretaker of a decedent whose estate was the subject of probate litigation. The caretaker had demanded payment from the attorney for the decedent's grandson in return for his testimony in a state civil suit regarding potential improprieties in the distribution of the decedent's estate. *See id.* at 903–04. On appeal after his conviction for attempted extortion, the caretaker had argued that the state civil suit was destined to fail, and therefore "any hope of success and possible economic profit was unreasonable." *Id.* at 907. The Seventh Circuit dismissed this argument, noting that the Hobbs Act does not require "a showing of certainty of success," and held that "a reasonable belief in some form of success and profit" was sufficient to sustain the defendant's conviction. *Id.*

■ The Court finds the Seventh Circuit's reasoning in *United States v. Mitov* persuasive, and does not believe that the uncertain magnitude of Everage's property interest invalidates its existence. The Court believes this holding is also consistent with the Sixth Circuit's recognition in *United States v. Collins* that contributors who paid for preferential treatment in government contracts stood to "lose the op-portunity to compete ... on a level playing field." 78 F.3d at 1030. Everage's reasonable belief in some form of success and profit, a belief that Vigil apparently shared judging by his request that Everage hire Sais, is sufficient to establish a property interest. The United States was not required to prove that Vigil attempted to deprive Everage of tangible property or that the property that Everage would have lost could be quantified: the "property" element of a Hobbs Act conviction requires "no more than the [victim's] right to make his business decisions free of threats and coercion, or other intangible rights." *United States v. Lewis,* 797 F.2d 358, 364 (7th Cir.1986).

■ The mere existence of a property interest, however, is not sufficient to establish a Hobbs Act violation. The Supreme Court has "construed the extortion provision of the Hobbs Act ... to require not only the deprivation but also the acquisition of property." *Scheidler II,* 537 U.S. at 404, 123 S.Ct. 1057. In other words, to be guilty of attempted extortion, it is not enough that Vigil attempted to deprive Everage of a property right; Vigil must have also attempted to "obtain" that property. *Id.* The Supreme Court in *Scheidler II* went on to hold that to "obtain" property under the Hobbs Act requires a defendant to have "pursued [ ]or received 'something of value from' [the victim] that they could exercise, transfer or sell." *Id.* at 405, 123 S.Ct. 1057 (quoting *United States v. Nardello,* 393 U.S. 286, 290, 89 S.Ct. 534, 21 L.Ed.2d 487 (1969)). *See United States v. Welch,* 327 F.3d 1081, 1108 n. 27 (10th Cir.2003)(explaining that the Supreme Court's holding in *Scheidler II,* requiring that a defendant "obtain" property to sustain an extortion conviction, distinguishes the Hobbs Act from other fraud statutes).

In *United States v. Gotti,* 459 F.3d 296 (2d Cir.2006), the Second Circuit articulated a two-pronged inquiry for determining whether the obtaining-of-property element had been met for the purposes of establishing extortion of intangible property under the Hobbs Act. The Second Circuit identified the key inquiry as "whether the defendant is (1) alleged to have carried out (or, in the case of attempted extortion, attempted to carry out) the deprivation of a property right from another, with (2) the intent to exercise, sell, transfer, or take some other analogous action with respect to that right." *Id.* at 324. In addition, the Second Circuit provided three examples how an extortion victim's property interest might be exercised, transferred, or sold:

These three examples illustrate various ways in which an extortion victim's property right might be exercised, transferred, or sold by an extortionist. In the first example, the victim is ordered to exercise his or her rights in accordance with the extortionist's wishes, such that the extortionist is essentially controlling the exercise of those rights. In the second example, the victim is ordered to transfer his or her rights over to the extortionist so that the extortionist can simply exercise those rights himself or herself. (A closely related variant would be where the extortionist orders the victim to transfer the rights to a third party of the extortionist's choosing.) In the third example, the victim's right is sold by the extortionist to a third party of the extortionist's choosing. The precise demarcation between an exercise and a transfer may certainly be subject to debate. Because the critical question is simply whether the defendant sought to exercise, transfer, or sell the rights at issue, however, we are less concerned with line-drawing between those terms than with the unifying principle for the "exercise, transfer, or sale" framework: the defendant's

intent to do something affirmative with respect to the property right.

*Id.* at 324 n. 9. The Second Circuit in *United States v. Gotti* made use of this analytical framework to evaluate five different scenarios of alleged extortion or attempted extortion. The Court finds each of these scenarios relevant and instructive.

The first count of extortion that the Second Circuit considered in *United States v. Gotti* involved allegations that members of the Gambino Organized Crime Family of La Cosa Nostra (the "Gambino Family") exercised control over the International Longshoremen's Association ("ILA") by using force to ensure that Gambino Family associates filled various executive positions within the union and then directing the activities of those associates. *See id.* at 302. The United States charged that the defendants had deprived union members of their rights to free speech and democratic participation in union affairs, as the Labor–Management Reporting Disclosure Act, 29 U.S.C. §§ 401–531 ("LMRDA") guarantees, and their rights to loyal representation by their officers. *See id.* Although these rights were intangible and not easily quantified, the Second Circuit found that these activities constituted a violation of the Hobbs Act, because "the government charges not only that the defendants caused the relinquishment of the union members' LMRDA rights, but also that the defendants did so in order to exercise those rights for themselves—indeed, in a way that would profit them financially." *Id.* at 325.

The second count of extortion related to certain defendants' scheme to use their control over the Management–International Longshoremen's Association Managed Health Care Trust Fund ("MILA")(the ILA's national health plan) to ensure that a particular company that a Gambino Fam-

ily associate owned, and which provided kickbacks to the defendants, received MILA's lucrative pharmaceutical services contract. *See id.* at 303. The Second Circuit determined that this scheme qualified as extortion under the Hobbs Act, because "the defendants sought to obtain ... the MILA participants' and beneficiaries' rights to have the MILA trustees contract with the service provider ... of the trustees' choice ... [and] that the defendants sought to exercise these rights for themselves by telling the MILA trustees which service provider to support." *Id.* at 326. According to the Second Circuit, under this scheme, "the defendants exercised the rights in question in order to profit themselves." *Id.*

The third count of extortion that the Second Circuit in *United States v. Gotti* considered involved an unsuccessful attempt by numerous defendants to force Tommy Ragucci, an employee at the Howland Hook Container Terminal, to resign from his position so that a Gambino Family associate could assume the position. *See id.* at 311. Although Ragucci was an at-will employee, and therefore had no guarantee of future earnings of continued employment, the Second Circuit held that "he surely had the right to be employed there for as long as he sought the job and his employer would have him." *Id.* at 326. The Second Circuit reasoned that this attempt sustained an extortion conviction because the defendants' actions "sought to deprive [Ragucci] of that right, and of its attendant salary, when they [unsuccessfully] ordered him to quit ... so that they could transfer that right ... to a third party of their choice." *Id.* at 326.

The fourth count of extortion in *United States v. Gotti* alleged that several defendants had extorted intangible property rights from Eduard Alayev, a restaurant owner, by forcing him to keep illegal gambling machines on his restaurant premises, and, when Alayev informed the defendants that he wished to sell the restaurant, by demanding that he sell it to an associate of the defendants and at a certain price. *See id.* at 313–14. The Second Circuit recognized that this action implicated a specific intangible property right—"the right to make various business decisions ... free from outside pressure." *Id.* at 327. Moreover, the Second Circuit noted that the defendants "essentially made themselves [Alayev's] silent partners and exercised his rights ... in a manner that would profit them." *Id.*

The fifth, and final, extortion count that the Second Circuit considered in *United States v. Gotti* related to the defendants' attempts to compel Steven Seagal, the prominent film actor, to work with Jules Nasso, an associate of the defendants. In the late 1980s, Seagal had formed a film-production company with Nasso, but in the mid–1990s, severed the business relationship because Seagal felt that Nasso had undergone a personality change and determined the he no longer wished to work with Nasso. Seagal testified that, throughout the course of several meetings and communications, he felt that the defendants were implicitly threatening him with violence if he did not begin to work with Nasso again. *See id.* at 314–15. The Second Circuit employed an analysis similar to that it used in analyzing the Alayev facts, and found that "the defendants sought to exercise for themselves Seagal's right to make his own business decisions, by threatening him with possible violence unless he worked with Jules Nasso again." *Id.* at 327. In sum, the Second Circuit determined "the defendants sought to exercise for themselves Seagal's intangible right to decide with whom to work, in order to secure profit for themselves." *Id.* at 327.

The Court believes that the evidence against Vigil is analogous to each of the Counts the Second Circuit addressed in *United States v. Gotti* and that, consistent with the elements of a Hobbs Act violation that the Supreme Court articulated in *Scheidler II,* a reasonable jury could have found Vigil guilty of attempted extortion beyond a reasonable doubt. A reasonable jury could have found that Everage had a property interest under several theories—including the right to contract with parties of Everage's choosing, the right to make business decisions free from outside pressure, and the right to decide with whom to work—and that Vigil attempted to obtain those interests with the intent of exercising those rights, or transferring them to Sais, for his own benefit. Taken in the light most favorable to the jury's verdict, the evidence was sufficient for a reasonable jury to conclude beyond a reasonable doubt that Vigil's actions constituted an attempt to violate the Hobbs Act.

### III. *THE EVIDENCE PRESENTED AT TRIAL DEMONSTRATED A NEXUS BETWEEN THE ATTEMPTED EXTORTION AND INTERSTATE COMMERCE.*

Vigil argues that the United States did not prove that his conduct affected interstate commerce. *See* Motion to Acquit at 13. He concedes, however, that the United States "presented proof at trial that[,] theoretically, the SLOM contract would have involved the oversight of brokerage firms that would lend securities for the State and that this lending would involve interstate commerce." *Id.* Nevertheless, he asserts that "the SLOM contract—whether owned by one person or split amongst two—would have had no impact at all upon the movement of securities across interstate lines." *Id.* Vigil argues that he, Everage, and Sais were all from New Mexico and that 18 U.S.C. § 1951 requires that the alleged act of extortion affect inter-state commerce. *See id.* at 13; Hearing Transcript at 30:13–15 (Bowles). Vigil contends that, because the alleged act of extortion was an attempt to cause Everage, a New Mexican, to pay Sais, another New Mexican, there was no practical effect on interstate commerce. *See* Hearing Transcript at 34:1–8 (Bowles). The United States counters that Vigil misstates the applicable standard and argues that, to sustain a Hobbs Act violation, there must only be the potential that a defendant's action will affect interstate commerce. *See id.* at 79:13–15 (Yarbrough).

The Court does not believe that the interstate commerce element can properly be given the narrow construction that Vigil applies. *See United States v. Croxford,* 170 Fed.Appx. 31, 40 (10th Cir.2006)(Browning, J.)(describing the task of identifying an effect on interstate commerce as a "modest one"); *United States v. Curtis,* 344 F.3d 1057, 1070 (10th Cir. 2003)("The [Hobbs] Act 'speaks in broad language, manifesting a purpose to use all the constitutional power Congress has to punish interference with interstate commerce by extortion, robbery or physical violence.'")(quoting *Stirone v. United States,* 361 U.S. 212, 215, 80 S.Ct. 270, 4 L.Ed.2d 252 (1960)). Because "the Hobbs Act is imbued with the full reach of Congress's *Commerce Clause* power ... the government need only demonstrate a *de minimis* affect on commerce." *United States v. Mitov,* 460 F.3d at 908. Moreover, "where there is no actual effect, the government need prove only 'a realistic probability of an effect ... on interstate commerce to bring [the extortion]' within prosecutorial reach." *Id.* (quoting *United States v. Peterson,* 236 F.3d 848, 852 (7th Cir.2001)). The government satisfies its burden by demonstrating a *potential* effect on interstate commerce. *See United States v. Toles,* 297 F.3d 959, 969 (10th

Cir.2002); *United States v. Wiseman*, 172 F.3d 1196, 1216 (10th Cir.1999).

Vigil cites two Seventh Circuit cases, *United States v. Mattson*, 671 F.2d 1020 (7th Cir.1982), and *United States v. Boulahanis*, 677 F.2d 586 (7th Cir.1982), in an effort to draw a distinction between cases involving depletion of a business' assets from those involving an individual's assets. *See* Motion to Acquit at 14. He argues these cases stand for the proposition that cases involving the depletion of personal assets are less likely to affect interstate commerce. *See id.* The Court does not believe, however, that, under the circumstances of this case, the distinction Vigil asserts is meaningful.

The defendants in *United States v. Mattson* were accused of attempting to extort $3,000.00 from Donald Anderson, Playboy Enterprises' chief electrician, in exchange for assisting Anderson acquire a supervising electrician's license from the City of Chicago. *See* 671 F.2d at 1021–23. In an attempt to save money, Playboy had requested Anderson obtain such a license so that Playboy employees, rather than commercial contractors, could perform major electrical renovations and repairs. *See id.* at 1021–22. In finding that the defendants' actions, although improper, did not establish the requisite nexus with interstate commerce, the Seventh Circuit noted that, although the Hobbs Act "is to be given an expansive construction, . . . neither the constitutional limits on the power of the national government, nor the jurisdictional requirement of some connection with interstate commerce can be ignored." *Id.* at 1023. In reaching its result, the Seventh Circuit did not draw any distinction between personal and business assets, however; it merely did not find the extortion had any potential effect, positive or adverse, on interstate commerce. The Seventh Circuit in *United States v. Mattson* acknowledged that electrical supplies

and materials might be purchased from outside of Illinois, but reasoned that, "[w]hether Playboy's own staff did the work, or Commercial Lighting was hired, the supplies would still have to be purchased outside Illinois by Playboy or Commercial Lighting." *Id.* at 1024.

In *United States v. Boulahanis*, the Seventh Circuit upheld the Hobbs Act convictions of two defendants who attempted to extort cash payments from the owner of a social club in exchange for the defendants permitting the club owner to allow gambling in the club. *See* 677 F.2d at 586. In an opinion authored by the Honorable Richard A. Posner, United States Circuit Judge, the Seventh Circuit accepted the prosecution's argument that, because these payments would deplete the assets that the club owner had to purchase coffee that he served at the club and that was shipped from out of state, the attempted extortion had the potential to affect interstate commerce. *See id.* at 590. Despite acknowledging that the club's coffee purchases amounted to approximately $68.00 per month, Judge Posner stated that "this court is committed to the view that commerce, within the meaning of section 1951(a), is 'affected when an enterprise, which . . . customarily purchases items in interstate commerce, has its assets depleted through extortion, thereby curtailing the victim's potential as a purchaser of goods.'" *Id.* (quoting *United States v. Elders*, 569 F.2d 1020, 1025 (7th Cir.1978)).

Judge Posner distinguished *United States v. Boulahanis* from *United States v. Mattson* because the latter case "involved the extortion of money from an individual rather than a business or other enterprise." *United States v. Boulahanis*, 677 F.2d at 590. Judge Posner noted that, "[i]n general, . . . though not in every case, businesses purchase on a larger scale than individuals . . . [and therefore] extortion is

likely to have a greater effect on interstate commerce when directed at businesses than at individuals." *Id.* Nevertheless, Judge Posner cautiously warned that this distinction did not preclude extortion of individuals from affecting interstate commerce: "It is true that individuals have assets just as businesses do, [and] that the depletion of an individual's assets could affect interstate commerce by causing him to buy less of some good or service which he obtains from out of state." *Id.*

Vigil suggests that, where the extortion of an individual involves only an "attenuated" or "speculative" potential of affecting an entity or group of individuals involved in interstate commerce, "'the realistic probability' that such commerce will be affected" is diminished. Motion to Acquit at 14. Vigil cites to *United States v. Collins,* 40 F.3d 95 (5th Cir.1994), and *United States v. Quigley,* 53 F.3d 909 (8th Cir. 1995), as cases where federal appellate courts have narrowly construed the interstate commerce element in cases involving the extortion of individuals. In *United States v. Quigley,* the United States Court of Appeals for the Eighth Circuit adopted the test the United States Court of Appeals for the Fifth Circuit articulated in *United States v. Collins* for determining whether extortion of individuals violates the Hobbs Act:

> Criminal acts directed towards individuals rather than businesses may violate [18 U.S.C.] § 1951(a) only if (1) the acts deplete the assets of an individual who is directly and customarily engaged in interstate commerce, (2) the number of individuals victimized or the sum at stake is so large that there will be some cumulative effect on interstate commerce, or (3) the acts cause or are likely to cause the individual victim to deplete the assets of an entity engaged in interstate commerce.

*United States v. Quigley,* 53 F.3d at 910–11 (holding defendants' robbery of two individuals of eighty-cents that prevented the victims from reaching a grocery store to purchase beer that moved in interstate commerce did not affect interstate commerce). *See United States v. Collins,* 40 F.3d at 100 (holding defendant's robbery of victim's personally owned vehicle and mobile telephone—that prevented the victim from attending a business meeting and using his telephone to make business calls—did not affect interstate commerce).

Vigil takes a limited view on the potential affects of his attempted actions and argues that "[d]epletion of Mr. Everage's potential personal assets is not a matter which affects the interstate economy." *See* Motion to Acquit at 16. The Court does not agree, however, that Vigil accurately describes the scope of potential effects his actions did have, and had Everage been more amenable to Vigil's attempt, realistically could have had. Applying the Seventh Circuit's depletion-of-assets theory, the Court first notes that the amount of money at issue in Vigil's trial was considerably more than the $68.00 per month upon which the Seventh Circuit affirmed the defendants' attempted extortion convictions in *United States v. Boulahanis.* The evidence at trial indicated that Sais had expectations of receiving up to $55,000.00 per year. *See* Everage Direct Examination at 55:12–14. Moreover, the Court does not agree that the attempted extortion was limited to Everage's personal assets. To the contrary, the evidence indicates that Everage had formed a limited liability company, SECSYS, LLC, to perform the work required under the SLOM contract. *See* Professional Service Contract between the NMSTO and SECSYS, LLC (Government's Exhibit 517).

█ Even if the Court assumes that Vigil was attempting to extort Everage in his individual capacity, a conclusion it declines to reach, and applies the three-part test articulated in *United States v. Collins* and *United States v. Quigley,* it finds that the necessary connection with interstate commerce has been established. First, the actions were intended to deplete the assets of Everage, an individual engaged in securities trading, an industry that necessarily involves interstate commerce. Second, the Court believes that the sums at stake—up to $55,000.00 per year at one point—were sufficiently large for a reasonable jury to determine that the depletion of those assets would have a cumulative impact on interstate commerce. Third, to the extent that Vigil's actions prevented Everage from performing the SLOM duties, those actions prevented the NMSTO, an entity involved in interstate commerce, from engaging in securities lending.

The Court believes a more persuasive analysis is reflected in the Eighth Circuit's recent decision in *United States v. Foster,* 443 F.3d 978 (8th Cir.2006). In *United States v. Foster,* the Eighth Circuit upheld the conviction of a city council member found guilty of attempted extortion under the Hobbs Act. *See id.* at 979. The defendant in *United States v. Foster,* an elected official on the city council in Pine Bluff, Arkansas, had attempted to obtain cash payments in exchange for the city council's approval of a commercial real estate development project. *See id.* at 980–81. After being solicited for money, however, the real estate developer, in cooperation with the Federal Bureau of Investigation ("FBI"), secretly recorded meetings with the defendant and therefore the extortion was never completed. *See id.*

The Eighth Circuit in *United States v. Foster* rejected the defendant's argument that the evidence underlying his attempted extortion was insufficient to establish the requisite nexus between his actions and interstate commerce. *See id.* at 983. The Eighth Circuit observed that "because the Hobbs Act criminalizes attempt crimes, 'it is enough that the conduct ... had the potential to impact commerce.'" *Id.* at 984. The Eighth Circuit in *United States v. Foster* noted that the defendant's attempted extortion had affected the real estate developer's project and that the evidence presented at trial indicated that the project would have involved: (i) the solicitation of contractors from across the country; (ii) ordering construction materials and supplies from sources outside of Arkansas; and (iii) financing provided through a federal agency. *See id.* Under the facts before it, the Eighth Circuit ruled that the defendant's conduct "had an actual, and certainly a potential, effect on interstate commerce." *Id.*

Everage testified that, once he signed and returned the SLOM contract to the NMSTO, the NMSTO sent him the bid proposals of three securities-lending agents with multi-state and multi-national operations—Dresdner Bank, Wachovia Bank, and Northern Bank—for him to review the agents' applications for the securities-lending agent position. *See* Everage Direct Examination at 93:13–22. Everage evaluated these agents' applications and prepared a report making recommendations to the NMSTO. *See* Securities Lending Evaluation Prepared by SEC-SYS, LLC (Government's Exhibit 524). Everage testified that, had a securities lending contract been executed, there certainly would have been transmission of securities and money across state lines, and companies outside of New Mexico would have been affected. *See* Everage Direct Examination at 140:3–10. Furthermore, the United States argues that not only did Vigil's attempted extortion have the potential to affect interstate commerce,

but that his attempt actually did affect interstate commerce by preventing the completion of interstate transactions that would have otherwise occurred absent his extortion. *See* Transcript at 82:4–9 (Yarbrough). The Court believes these facts are comparable to those the Eighth Circuit considered in *United States v. Foster*, and are sufficient to find that Vigil's conduct had a potential, if not actual, effect on interstate commerce.

Securities lending involves, by its very nature, transactions based upon securities, which are themselves instrumentalities of interstate commerce. Indeed, Vigil acknowledges that "[t]he government presented proof at trial that[,] theoretically, the SLOM contract would have involved the oversight of brokerage firms that would lend securities for the State and that this lending would involve interstate commerce." Motion to Acquit at 13. Nor is there any dispute that the NMSTO's securities-lending activities would have involved the solicitation of bids from out-of-state securities-lending agents. These factors are sufficient for the Court to conclude that Vigil's attempt to manipulate the execution of the NMSTO's securities-lending activity, and specifically, Everage's oversight of the securities-lending agents selection process, would have the ordinary and natural consequence of affecting commerce.

## IV. VIGIL WAS ON NOTICE THAT HIS CONDUCT WAS ILLEGAL, AND HIS CONVICTION DOES NOT OFFEND DUE PROCESS.

As a final argument, Vigil contends that "[t]he Hobbs Act does not give fair warning that the facts of this particular count would violate its terms." Motion to Acquit at 15. Vigil asserts that "constitutional due process requires that 'no man shall be held criminally responsible for conduct which he could not reasonably understand to be proscribed.'" Motion to Acquit at 14

(quoting *United States v. Harriss*, 347 U.S. 612, 617, 74 S.Ct. 808, 98 L.Ed. 989 (1954)). Vigil maintains that this constitutional imperative is necessary to prevent "arbitrary and erratic arrests and convictions." Motion to Acquit at 14 (quoting *Papachristou v. City of Jacksonville*, 405 U.S. 156, 162, 92 S.Ct. 839, 31 L.Ed.2d 110 (1972)).

Vigil states that "[m]odification of a contract proposal to require a bidder to split the contract thereby lowering his potential compensation is not something the average citizen would understand to be a crime." Motion to Acquit at 14. Vigil argues that his conviction offends due process because it constitutes an expansion of the Hobbs Act, without fair warning, "into the world of ordinary contractual disputes." Motion to Acquit at 15. The cases Vigil cites for this proposition, *United States v. Bass*, 404 U.S. 336, 92 S.Ct. 515, 30 L.Ed.2d 488 (1971), and *McNally v. United States*, 483 U.S. 350, 107 S.Ct. 2875, 97 L.Ed.2d 292 (1987), although not Hobbs Act cases, do counsel that a statute's language must be definite enough to provide notice that the law prohibits a defendant's actions. *See United States v. Bass*, 404 U.S. at 348, 92 S.Ct. 515 ("[B]ecause of the seriousness of criminal penalties, and because criminal punishment usually represents the moral condemnation of the community, legislatures and not courts should define criminal activity."); *McNally v. United States*, 483 U.S. at 360, 107 S.Ct. 2875 (stating that, before a defendant can be punished, "it must be shown that his case is plainly within the statute")(quoting *Fasulo v. United States*, 272 U.S. 620, 629, 47 S.Ct. 200, 71 L.Ed. 443 (1926)). The United States does not deny that criminal statutes require definiteness, but counters that Vigil's conduct falls within the Hobbs Act's plain meaning, and that, under the law, Vigil is presumed to know that it was illegal for him to attempt to extort pay-

ment to Sais.[4] *See* United States' Response at 22–23.

■ As a general rule, a defendant cannot assert ignorance of the law as a defense to a criminal prosecution. *See Cheek v. United States,* 498 U.S. 192, 199, 111 S.Ct. 604, 112 L.Ed.2d 617 (1991). Moreover, the Court does not find Vigil's characterization of his activities persuasive. In reviewing a motion for acquittal, the Court must interpret the evidence in the light most favorable to the United States, and the Court believes that a reasonable jury could have found that Vigil was not merely altering contract terms, but attempting to direct payments, to which he was not entitled, to Sais.

■ The Hobbs Act expressly prohibits attempts to extort payments by wrongful use of threatened fear or under color of official right. *See* 18 U.S.C. § 1951(a), (b)(2). Moreover, the Court presumes that Vigil understood he had no entitlement to fees that the SLOM would have earned, and did not have a personal or official right to direct the distribution of those fees. That the lending activity was not completed is irrelevant, because Vigil was convicted of attempted extortion; the Hobbs Act prohibits attempts to manipulate fees private entities generate and pos-

sess. Thus, even if the Hobbs Act was one of "those rare cases in which due process requires that [a defendant] have had actual notice of the prohibited behavior," the Court believes that the Act put Vigil on sufficient notice that his conduct was illegal. *United States v. Alderman,* No. CR06–0117C, 2006 U.S. Dist. LEXIS 44108, at *11 (W.D. Wash. June 27, 2006). The Court believes that this holding is also consistent with federal caselaw, particularly the Sixth Circuit's decision in *United States v. Collins,* the Second Circuit's decision in *United States v. Gotti,* and other cases that have upheld convictions premised on the extortion of intangible rights, including the right to compete for government contracts on a level playing field and the right to make business decisions free from undue influence.

The Court concludes that the evidence presented at trial was sufficient for a reasonable jury to find beyond a reasonable doubt that Vigil attempted to extort payments from Everage in violation of the Hobbs Act. Everage's reasonable expectation of some profit, his right to compete fairly for government contracts, and the right to conduct his business free from coercion all established a property interest that the jury could have determined Vigil

---

**4.** The United States also argues that Vigil had actual knowledge that his conduct was illegal. *See* United States' Response at 22. The United States alleges that, during the time Vigil was State Auditor, he was the subject of an investigation that the New Mexico Attorney General performed regarding allegations that Vigil exchanged state contracts for personal and political contributions. *See id.;* United States' Motion in Limine Regarding Admissibility of Federal Rule of Evidence 404(b) Material at 5–6, filed August 8, 2006 (Doc. 275). In response to a motion in limine the United States filed before trial, the Court ruled evidence of this investigation inadmissible under rule 404(b) of the Federal Rules of Evidence and evidence of this investigation was not presented to the jury. *See* Memorandum

Opinion and Order, filed September 1, 2006 (Doc. 330).

At this stage in the proceedings, the Court recognizes that evidence of such an investigation could be relevant to determining the legal question whether Vigil had notice that his conduct was illegal. Nevertheless, on the record before it, the Court does not have enough information about the facts underlying the Attorney General's earlier investigation to make a fair comparison to those underlying Vigil's conviction necessary to assess whether Vigil had actual knowledge that the Hobbs Act prohibited his conduct. Because the Court finds that Vigil's conduct falls within the plain language of the Hobbs Act, however, it need not decide that issue at this time.

attempted to extort either by threatening Everage with economic harm or under color of official right. In addition, the Court believes that Vigil's attempt to manipulate monies generated by securities lending—an activity involving interstate activity—establishes the requisite nexus between Vigil's conduct and interstate commerce necessary to fall within the auspices of the Hobbs Act. Finally, the Court concludes that the Hobbs Act put Vigil on sufficient notice that his actions were illegal, and thus his conviction does not offend due process.

**IT IS ORDERED** that Vigil's Motion to Set Aside Verdict and for Judgment of Acquittal on Count 24 of the Fifth Superseding Indictment Under Fed. R.Crim.P. 29 or in the Alternative for New Trial on Count 24 is denied.